**The PEOPLE of the State of South Dakota In the Interests of E.D.J., Minor Child, and concerning C.M. and H.M., Jr., Parents.**

Nos. 17825, 17864.

Supreme Court of South Dakota.

Argued Nov. 18, 1992.

Decided April 14, 1993.

Robert C. Riter, Jr. of Riter, Mayer, Hofer & Riter Pierre, for appellant C.M., Mother.

Jamie L. Post, Pierre, for appellant E.D.J., Minor Child.

Mark W. Barnett, Atty. Gen., Joan P. Baker, Asst. Atty. Gen., Pierre, for appellee State of South Dakota.

MILLER, Chief Justice.

Mother and Child appeal the circuit court's order terminating Mother's parental rights. We affirm.

## FACTS

E.D.J. (Child) was born April 10, 1979. His mother and biological father never married. Prior to September, 1988, Child lived in Wyoming where he acquired a stepfather. On September 4, 1988, Child, Mother and stepfather came to Pierre, South Dakota. The household also included his older brother, H.M., Jr. (Brother), a twenty-six-year-old aunt (M.), her husband (D.) and their six-year-old son, (R.).[1] In October, D. committed suicide. Child observed D. hanging by the neck in the family home.

A few weeks after this incident, Child's fourth-grade classmates were told to draw pictures of what they wanted to be when they grew up. Child, age nine, drew a picture of a person hanging by the neck from a building. Across the top of the picture he wrote "I am going to kill myself. This is me dead."

Child's school counselor interviewed him, filed a referral with the South Dakota Department of Social Services (DSS), and reported what had occurred to the Pierre Police Department. Child was interviewed by an officer who removed him from the home with Mother's approval. Mother knew Child had threatened suicide in the past and felt he might commit suicide if left unattended. Child was placed with Child Protection Services.

A November 4 hearing placed Child into foster care. Frank Dame, Phd., a clinical psychologist, evaluated Child and on November 18, Child was placed at McKennan Hospital's Psychiatric Acute Care Unit in Sioux Falls, South Dakota, where he underwent evaluation and treatment. Mother and employees of DSS signed the first of several "Case Service Plans" a few days before the February 28, 1989, adjudicatory hearing. Child was found to be neglected or dependent.[2]

The court ordered DSS to maintain custody of Child while efforts were made to reunite Mother and Child. Child was transferred to Crossroads, which is a facility operated by Children's Home Society in Sioux Falls. That spring, Mother moved to Salem, South Dakota, which is approximately thirty-five miles from Sioux Falls. By October, the counselors at Crossroads felt Child needed a structured home environment. He was placed in a therapeutic foster home associated with Crossroads in Viborg, South Dakota. This placement appears to have been without the particular knowledge of Mother due to the fact that DSS was unable to find her.[3]

Mother abducted Child on October 30, 1989. He was located in Texas five weeks later.[4] Mother disappeared August 7,

1. Child is the youngest sibling. Brother was born in 1972. Two older sisters, born in 1974 and 1976, were no longer living in the family when Mother moved to South Dakota. Child has seen stepfather abuse at least one of his sisters and has himself been disciplined with a belt by both stepfather and Mother.

2. This action was filed under former SDCL 26–8–35 thru –35.3, and was styled a "dependency or neglect" proceeding. These sections were amended in 1991 and relocated to SDCL 26–8A–20, 22, 24 & 26. This action would now be styled an "abuse or neglect" proceeding.

3. When Child's transfer to Viborg was first planned, as far as DSS and Crossroads knew, Mother was still living in Salem. During this same time period, Iowa's Social Services Department was attempting to develop a case service plan for Mother's two daughters. Mother was uncooperative and at one point told them they could throw her girls in jail or in a group home.

4. Mother later pled guilty to the criminal charge of removing a child from the state. She received a suspended imposition of a five-year sentence upon terms which included that she remain in South Dakota for the period of her probation. After Child's abduction, he was returned to Crossroads by DSS for evaluation. He was angry with Mother, and for a period of time after, he was apprehensive and afraid Mother would take him again. Five days later he was back in Viborg. His behavior deteriorated for a while, but he finished out the school year in Viborg.

1990, and was not heard from for fourteen months.[5] Eight months after her disappearance, DSS filed a second amended petition requesting termination of parental rights. A hearing was set for May 13, 1991. Mother could not be located and, after service by publication, an adjudicatory hearing was finally set for October 23.[6]

Nine days before this hearing, Mother contacted her attorney who advised her of the upcoming adjudicatory hearing. Mother absented herself from the adjudicatory hearing though her interests were represented by her attorney. The court entered its adjudicatory findings of fact and conclusions of law finding State had proved by clear and convincing evidence that Child was abused and neglected. His custody was ordered to continue in DSS and a dispositional hearing was set for January 2, 1992, at which Mother did appear. At the conclusion of this hearing the court terminated Mother's parental rights from the bench.[7] This termination was subsequently embodied in a final order which was filed along with the trial court's dispositional findings of fact and conclusions of law. Mother and Child filed separate appeals which we have consolidated.

## ISSUE I

### WHETHER THE TRIAL COURT ERRED WHEN IT DID NOT DISMISS THIS ACTION.

Mother, who was not served with actual notice and did not attend the 1991 adjudicatory hearing, asserts the trial court erred when it denied her motion to dismiss for improper service. In support of her asser-

tion, she refers this court to *Tulsa Professional Collection Serv. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988).[8] There the Supreme Court held if the identity of a probate creditor is known, publication alone does not satisfy due process which requires "notice by mail or other means as certain to ensure actual notice." *Id.*, 485 U.S. at 491, 108 S.Ct. at 1348, 99 L.Ed.2d at 579 (citation omitted). It appears that identification of a party, not their location, was at issue there. Further, that case was remanded to determine "whether 'reasonably diligent efforts' would have identified [the probate creditor.]" *Id.* (citation omitted). The record before this court supports the trial court's description of State's efforts to locate Child's parents as due and diligent, even "extraordinary."

 Service by publication is permitted upon a party who is out of state and who "on inquiry cannot be found[.]" SDCL 26–7A–48; *In re J.W.W.*, 334 N.W.2d 513, 516 (S.D.1983).[9] Mother disappeared August 7, 1990. Eight months later, DSS filed a second amended petition requesting termination of parental rights. No one had heard from Mother since August and she could not be located, so State moved to make service by publication in newspapers in the last known locations of Child's parents. Though Mother's attorney did not know where Mother was, he resisted State's motion and State's motion was denied. State was ordered to continue its attempts to make personal service. On August 15, State renewed its motion which was granted at a September 4 hearing. Even so, the court stated it wanted to wait

---

5. After Mother disappeared, Child's behavior went out of control and he had to be returned to Crossroads on October 5. Child returned to a foster home in the Pierre area in February, 1991.

6. During this time, there were arrest warrants out for Mother for violating her abduction probation as well as for insufficient funds check writing.

7. The court also terminated the parental rights of Child's biological father from the bench noting that more than three years had elapsed since Child's father had been in contact and that all

attempts to contact Child's father had been fruitless.

8. Mother also finds support in the court's statement that it had a "real serious problem with the type of service that we have being service by publication." We point out, however, this statement referred to the court's reasons for denying State's motions for default judgments against Child's parents for failure to appear and for a default termination of their parental rights.

9. This statute and our case law provide additional requirements which must be met before service by publication is permitted.

"at least a couple weeks for the word to get out if it is going to get out" before scheduling a hearing date.

■ After fourteen months of silence, and barely a week before the hearing, Mother contacted her attorney who advised her of the October 23 adjudicatory hearing which could lead to termination of her parental rights. She did not tell her attorney where she was or how she could be located. A party will not be heard to complain that service was defective where the inability to achieve personal service was due to the complaining party's decision to make it impossible to be served personally. *See In re B.A.R.*, 344 N.W.2d 90, 92 (S.D.1984) ("If the mother was at all injured by the lack of notice, it was her own doing." *Id.*). We need not decide whether *Tulsa Professional Collection Serv.* is applicable to the instant facts as its holding was complied with: Mother had actual notice. Further, her attorney represented her interests. The court did not err when it denied Mother's motion to dismiss.

## ISSUE II

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED MOTHER'S MOTIONS FOR CONTINUANCE.

■ Mother alleges the trial court erred in denying her several motions for continuance of the 1991 adjudicatory hearing. "[T]he granting or refusal of a continuance is within the sound discretion of the circuit court, and its rulings will not be reversed absent a clear abuse of discretion." *In re D.H.*, 408 N.W.2d 743, 746 (S.D.1987); *In re C.J.H.*, 371 N.W.2d 345, 349 (S.D.1985). "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Gross v. Gross*, 355 N.W.2d 4, 7 (S.D.1984). The burden rests on Mother to insure her availability at the time of the hearing, *C.J.H.*, 371 N.W.2d at 349, as a dependency and neglect hearing can proceed without the presence of the parent if the interests of the parent are accommodated. *Id.; B.A.R.*, 344 N.W.2d at 92.

■ The original hearing date, May 13, 1991, had been rescheduled several times before it finally began on October 23. Mother gave her attorney various excuses why she could not attend. She did not know when she would be able to return. She told her attorney only that it would be at some indefinite point in the future, at least six weeks away. Nevertheless, at Mother's request, her attorney filed a motion, prior to the hearing, for a continuance which was denied as being in Child's best interests. Mother's attorney repeated this motion at the hearing and it was again denied. The hearing could not be concluded on October 23. It was continued to, and concluded on, November 12. Still Mother was absent. We have previously stated that a mother's

> departure from the jurisdiction and her failure to maintain contact with relatives, attorney, or the court justified the court in not continuing the matter until the mother should return to South Dakota at some unforeseeable future date.

*B.A.R.*, 344 N.W.2d at 92. *See also C.J.H.*, 371 N.W.2d at 349.

Mother's interests were represented by her attorney. The adjudicatory hearing had already been delayed numerous times. Child had been in the custody of DSS for almost three years at this time. The trial court did not abuse its discretion when it found it was in Child's best interest to deny Mother's motions for continuance.

## ISSUE III

WHETHER THE TRIAL COURT WAS CLEARLY ERRONEOUS WHEN IT FOUND CHILD WAS A DEPENDENT OR NEGLECTED CHILD.

■ Mother asserts the trial court's determination that Child is dependent or neglected is based upon factual findings which are clearly erroneous. State must show by clear and convincing proof that Child is dependent or neglected. *In re S.L.*, 419 N.W.2d 689, 692 (S.D.1988); *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599, 617 (1982).

"This court does not decide factual issues de novo[.]" *In re D.H.*, 354 N.W.2d 185, 188 (S.D.1984). We will not disturb the court's findings "unless they are clearly erroneous and we are, after a review of all the evidence, left with a definite and firm conviction that a mistake has been made." *In re A.M.*, 292 N.W.2d 103, 105 (S.D.1980) (citing *In re V.D.D.*, 278 N.W.2d 194, 197 (S.D.1979)).

■ The trial judge told Mother during the 1989 adjudicatory hearing that, though State was not attempting to terminate her parental rights at the moment, such an attempt was just a "very small step" from where they were. Mother said she understood it was up to her to "make significant changes in [her] life and in [her] approach to parenting[.]" Mother now asserts the record demonstrates the court was clearly erroneous when it found she only "minimally complied with" her several case service plans and when the court characterized her compliance as "perfunctory at best." A review of the record convinces us the trial court's characterizations are not clearly erroneous.

The highlights of Mother's compliance with her first case service plan, which was in effect for eight months, are brief. In June, 1989, four months into that plan, Mother, and sometimes stepfather, began to attend weekly family therapy sessions. Even so, two of those sessions only came about because Child's caseworker took him to see Mother. She attended only one session each in July and in August.[10] Aside from these family therapy sessions, Mother visited Child only twice. She failed to keep visitation appointments, including one set up on Child's birthday. Mother neither wrote nor phoned Child between April and September. Mother also moved back to the Pierre area without notifying DSS.

In October, 1989, a review hearing was held and a new, more structured case service plan, nineteen sections long, was signed by Mother and DSS. As before, it required Mother to attend alcohol treatment programs, family therapy, counseling and parenting classes, though now the time table was more structured. She was also required to maintain contact with Child at least once a week through a phone call and a letter. Shortly after she signed this plan, Mother used trickery on Child to abduct him from Viborg, where he was in a foster home. We are not persuaded by Mother's assertions that these requirements were so onerous as to explain why her compliance with this second plan was almost nonexistent.

Mother signed another case plan in March, 1990.[11] Various concessions were made by DSS, but Mother again failed to follow through. In May, this case service plan was modified. A progress review meeting was held July 18 after several postponements due to Mother's failure to appear. This review showed that in a period of five weeks, from the end of May through the end of June, Mother attended four of seven appointments with her mental health counselor, three of four appointments with a psychologist, two-thirds of her AA meetings, and she met with Child at least once a week. Though this was Mother's best attempt to meet any case service plan, her compliance was still such that the tentative September date for reunification was to be delayed. Mother saw Child on August 7 and then disappeared for fourteen months.

Although there were occasions of at least partial compliance with at least some portions of some of the case service plans, the record is replete with numerous instances where Mother failed to do anything to meet her service plans. The record fur-

10. The single session in August saw Mother and stepfather attending after they had been drinking. Though it was contrary to normal procedure, and very little therapy could be achieved, Mother was allowed to have contact with Child because she so seldom saw him.

11. While this plan was being developed, the parties discussed transferring Child from Viborg to a foster home in the Pierre area at the end of the school year and possibly reuniting Mother and Child by the start of the 1990–91 school year. Child had made plans to be involved in two wagon trains following school. Mother and everyone else felt it was in Child's best interest to participate, so his placement in a Pierre area foster home occurred in July 1990.

ther reveals numerous instances where Mother made appointments for counseling, for treatment, for AA, for visitation, and for phone calls, but failed to keep them. A few weeks of partial compliance in 1989 and 1990 by Mother, with only two of what amounts to four case service plans, does not leave us with the conviction the trial court was mistaken when it characterized Mother's compliance as "minimal" or "perfunctory."

Mother next disputes the court's finding that she initially showed little affection and had initial problems of parenting in her first therapy sessions. During the June, 1989, sessions, Mother's parenting skills appeared to be improving and counselors felt she was developing a good bonding relationship with Child. Nevertheless, the record also shows Child's relationship with Mother was reversed in that his role was more "like a parent instead of a child[.]" Mother's offer of her later behavior to dispute this finding is not relevant to the court's finding concerning her initial behavior. In this regard, abducting Child through trickery and disappearing from Child's life for in excess of a year, tends to refute assertions of later good parenting. This finding is not clearly erroneous.

Lastly, Mother asserts there is nothing to support the finding that Child was sexually abused or exposed to sexual abuse in the "home environment." The record shows otherwise. When Child was first removed from Mother's home, he told the police officer his fifteen-year-old brother was sleeping, and having sex, with his aunt, M., since her husband, D., committed suicide. Child also related M.'s six-year-old son, R., was sleeping in the same bed with M. and Brother and that when R. wakes up while they are having sex, M. beats R. Mother admits she condoned this situation.[12] Child also related that he was sleeping with his mother and would get angry when he had to get out of bed when his mother brought other men home to her bed.

As a result of Child's evaluation at McKennan Hospital's psychiatric unit, there was concern about Child's belief that D. had not committed suicide. Child believed one of D.'s homosexual friends had killed him and Child would be the next victim. While at Crossroads, Child disclosed other sexual abuses which had occurred to him in Wyoming by a man who was living in the Pierre area and who was often at Mother's home. Mother admitted at the first adjudicatory hearing in 1989, that Child "has been subjected to mistreatment or abuse by his stepfather and/or a grandparent." The evidence clearly and convincingly supports this finding and the trial court's conclusion that Child was dependent and neglected.

## ISSUE IV

## WHETHER THE TRIAL COURT ERRED WHEN IT TERMINATED MOTHER'S PARENTAL RIGHTS.

■ Child and Mother dispute various of the trial court's dispositional findings of fact in support of their assertion the trial court erred when it terminated Mother's parental rights. Termination of Mother's parental rights must be supported by clear and convincing evidence that it is in the best interests of Child to do so and is the least restrictive alternative available commensurate with those interests. *In re K.C.*, 414 N.W.2d 616, 620 (S.D.1987).

■ "The least restrictive alternative is viewed from the child's point of view, not that of the parent, as the prime concern of the court is the child. The best interests of the child must prevail." *In re S.W.*, 398 N.W.2d 136, 139 (S.D.1986). *See also Santosky*, 455 U.S. at 760–61, 102 S.Ct. at 1398–99, 71 L.Ed.2d at 611.[13] "The question before this court is not whether [we]

---

12. Brother was placed in a detention facility when Child was taken from the home in 1988. M. was arrested and charged with fifth-degree rape and R. was placed with Child Protection Services.

13. For reasons unclear, Mother alleges the court's finding that the "best interests of the child balanced against the right of the parents require that the parental rights must give way to what is best for Child" is clearly erroneous. It is not. *S.W.*, 398 N.W.2d at 139. *See also*

would have made the same findings the trial court did, but whether the entire evidence leaves a definite and firm conviction that a mistake has been committed." *D.H.*, 354 N.W.2d at 188; *In re J.M.A.*, 286 N.W.2d 324, 326 (S.D.1979). If "efforts to aid or counsel parents by the use of social services proves unavailing, termination of parental rights is justified." *In re D.A.B.*, 313 N.W.2d 787, 788 (S.D.1981) (citing *In re T.L.J.*, 303 N.W.2d 800, 806 (S.D.1981)).

Mother and Child dispute findings VI, VII, IX, X, and XI, although only Child makes specific arguments as to these findings.

Mother and Child challenge the court's findings that Mother "indicates that she does not intend to work with DSS in the future" and that Mother "has not manifested to the child or DSS, ... a firm intention to resume physical custody of the child or to make suitable arrangements for his care." Mother and Child were present for the dispositional hearing and both testified. Mother testified she left Child and went to Las Vegas, Nevada, in August, 1990, because she felt it would be better for Child if she stayed away from him, though she no longer believes this may be true. Nevertheless, she intends to remain in Nevada.

Mother stated she would be willing to let Child be in foster care until the court determined she could provide the stability Child's home life required.[14] Mother stated that if Child was ordered into long-term foster care she would only be able to visit Child on holidays as her work would permit; but she could also phone and write him. Mother said she could accept her parental rights being terminated but she still loved Child and was afraid he would have problems if he was not allowed to talk, write or see her.[15] We note however,

the record clearly shows that since Child was removed from Mother's home in 1988, Mother has only rarely contacted Child.

Regarding Child's disposition, Mother said it will be God who makes the decision "and it will just come out of Judge Anderson's mouth." The trial court noted that although Mother had perhaps made great strides in her life, she has neglected to do what is necessary to raise Child. The court had before it the conclusions of Mother's February, 1990, psychological examination which concluded that Mother

> appears to be quite emotionally immature, has obvious tendencies to react in the extremes, exhibits a decreased sense of responsibility with decreased accessibility for change, and pronounced tendencies to be hypersensitive and prone to overreact without adequate thought to the consequences. She has a propensity for minimizing her problems and her responsibilities for actions, for projecting blame to others, and for rationalizing her own actions and responses, rather than accepting consequences for her own actions. She exhibits some indications of anger and hostility and a significant tendency to manipulate information and details in an attempt to project blame to others.

These conclusions are supported by the record. Mother and Child allege the many changes in the case service plans and in Child's foster placements have caused Mother's problems. They are mistaken. These changes occurred *because of Mother's behavioral problems;* they were not the *cause* of her behavior. There is little to indicate Mother intends to put Child's interests first. The trial court was not clearly erroneous.

Mother and Child contest the court's finding "the conditions that led to removal

---

*Santosky*, 455 U.S. at 760–61, 102 S.Ct. at 1398–99, 71 L.Ed.2d at 611.

**14.** To achieve this stability, Mother said she could obtain "additional" counseling and intervention in Las Vegas. To date, Mother has received no individual counseling there. In South Dakota, Mother has received only a few weeks of individual counseling since Child was removed in 1988, though that has been a requirement under each of her case service plans.

**15.** The parties were asked at oral argument whether termination of parental rights would mean no contacts would be possible between Mother and Child. The parties were not sure and the question has not been briefed. The statutes themselves refer only to a termination of *legal* rights and *legal* obligations. *See, e.g.*, SDCL 25–5A–18; 25–6–16 & 17; 26–8A–26 & 27.

still exist and are not likely to be remedied so that Child can be returned." [16] The parties assert those conditions only include inappropriate sexual activity and suicidal ideations. The evaluation of Child at McKennan Hospital concluded Child had suicidal ideations. They point out that Child made good progress at Crossroads in resolving his behavioral problems and his suicidal ideations.

We point out, however, that Child had numerous other problems such as concerns about Mother's and stepfather's heavy drinking.[17] Child lived in a "very destructive social/personal environment and ... his home life certainly was contributory to his current problems." Crossroads' counselors felt Child needed a structured home environment. Child often bragged he could do anything he wanted at home and that Mother could do nothing with him. Mother has failed to get counseling and therapy to help her overcome the conditions which led to Child's removal.

Mother says yet again she will comply. Mother testified that in Las Vegas she has developed a circle of friends as a type of support system, has "found religion" and no longer sees herself as "addicted" to stepfather. At oral argument, Mother's counsel pointed out Mother has been willing to *say* anything to get Child back. Unfortunately, Mother has not been willing to *do* much of anything to be reunited with Child. "[W]hen it comes to something as important as the welfare of young children, promises of the parents to conform to the standard of care for their children which is expected in our society do not carry as much weight as their past actions of not properly caring for the children." *In re J.M.V.D.*, 285 N.W.2d 853, 855 (S.D.1979). This finding is not clearly erroneous.

Much time is spent by the parties asserting that, in the mind of DSS, "permanency" is defined as "adoption;" as adoption of Child is not likely, the court could not find termination of parental rights was in the child's best interests.

There was testimony that though older children such as Child are difficult to place in adoptive homes, his chances of adoption were better now than they would be later. One of Child's DSS caseworkers and Frank Dame, Phd., testified that generally foster care or group home placement is less restrictive than termination.[18] DSS could recommend no less restrictive alternative than termination of Mother's parental rights although reuniting parent and child is their usual goal.

Dame testified that Mother is a thirty-seven-year-old manic depressive and that manic depressive episodes often tend to become less severe and violent as people advance into their 40s. Dame said Mother's problems in her life are treatable, but only if she desires to assume responsibility as Child's parent and then to follow through with necessary counseling and treatment. At the time of his initial recommendations for Mother's treatment, Dame felt she would be able to follow through with them. In light of her subsequent behaviors, he was no longer as convinced that she would follow through.

Dame thought a combination of Mother's working with a therapist and Child's placement in a long-term group home would be a workable alternative. *But the essential element for a group home to have any possibility of success was Mother's active involvement in Child's therapy.* Dame's proposed plan would not be workable if Mother was in Nevada and Child was in South Dakota. He testified that in light of Mother's unwillingness to leave Nevada,

**16.** Child also contends that contrary to the court's finding, the record does not indicate Mother made no attempt to protect Child from physical or sexual abuse, or that she did not provide supervision necessary to assure his safety. This assertion has been substantially addressed *supra*, so we do not address it again. This finding is not clearly erroneous.

**17.** Sometime in mid-summer 1990, Mother divorced stepfather, although a few weeks later she let him move back in with her. Stepfather

was to have an alcohol assessment completed by July 1, and was required to move out from Mother's home by September 1. Mother was aware that if stepfather did not have an alcohol assessment there could be problems reuniting her with Child.

**18.** The parties' assertion that the trial court's findings misstate the testimony of Frank Dame is without merit.

there was even less likelihood of success than if Mother and Child were together. Dame said that if Mother would not follow through with the recommendations that have been made, Child would be better off having Mother's parental rights terminated and not seeing her.

Child had mixed feelings about staying with Mother. Several times he testified that although he would prefer to live with her, he would rather just be adopted if she could not control her life. Child was aware adoption may never occur. He loves Mother and would like to be able to stay in contact with her, but he does not want to be left again.

The trial court did not equate "permanency" with "adoption." All parties were aware that adoption was only a possibility, not a certainty. We note that since this case first came to the attention of the court, Child has been placed in one foster home, then in a second foster home, then at McKennan Hospital, then in another foster home, then with Crossroads and then in a foster home in Viborg. From there he was abducted and taken to Texas by Mother. After Child's whereabouts was discovered, he was returned to Crossroads, then he was returned to the foster home in Viborg, then he was placed with a foster home in the Pierre area, then he was returned to Crossroads, then he was placed in a Ft. Pierre area foster home and, finally, Child was placed at Crossroads where he remained at the time of the dispositional hearing. The trial court is correct. Child needs a sense of permanency. The record contains clear and convincing evidence to support the trial court's determination that termination of Mother's parental rights is in the best interests of Child and is the least restrictive alternative available commensurate with those interests. *K.C.*, 414 N.W.2d at 621.

Affirmed.

WUEST, HENDERSON, SABERS and AMUNDSON, JJ., concur.