The PEOPLE of the State of South Dakota, ex rel. SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES, In the Interests of C.H., S.H., S.H., C.H., M.H., S.H. and C.H., Minor Children, and concerning C.O.H. and D.H., Sr.

No. 18230.

Supreme Court of South Dakota.

Considered on Briefs on Oct. 5, 1993.

Decided Dec. 22, 1993.

Jerry L. Wattier of Riter, Mayer, Hofer & Riter, Pierre, for appellant mother, C.O.H.

Mark W. Barnett, Atty. Gen., Joan P. Baker, Asst. Atty. Gen., Pierre, for appellee State of S.D.

MILLER, Chief Justice.

C.O.H. (Mother) appeals the decree of disposition terminating parental rights over her six minor children (S.H., S.H., C.H., M.H., S.H., and C.H.).[1] We remand to the trial court for proceedings as directed herein.

## FACTS

On March 4, 1992, the State of South Dakota filed a petition alleging Mother's eight youngest children were abused and neglected.[2] Starting in 1982, the South Dakota Department of Social Services (DSS) documented at least twenty-four referrals concerning neglect of the physical, medical and educational needs of the children.

An adjudicatory hearing was held on May 11, 1992, and Mother, who was represented by counsel, admitted that the children were abused and neglected. The court scheduled a dispositional hearing for August 10, 1992. After Mother agreed to fully comply with a DSS family services plan ordered by the court, the children were left in her custody.

---

1. Father's parental rights were terminated in the same action; he has not appealed.

2. The petition is moot as to C.H., who has attained her majority. A modified petition was later filed removing the name of six-month-old C.O., who died of Sudden Infant Death Syndrome five weeks after the original petition was filed.

After a brief period of cooperation, Mother failed to complete any of the goals in the family services plan. The home was not maintained at a minimum standard of cleanliness. No places were cleared for the children to sleep. Mother continued to leave the children home alone. She avoided DSS workers by canceling or failing to show up for scheduled office visits.[3] When DSS workers arranged visits at the home, Mother would not be there. DSS continued to receive referrals concerning the children.

Mother did not personally appear at the August 10, 1992, hearing. The court found that she had failed to comply with the DSS family services agreement, that the children were in imminent danger, and ordered their removal from the home for their protection. After their removal to foster homes, weekly visits with the children were scheduled for Mother; she showed up only twice between August 12 and December 1.

The dispositional hearing was held on December 1, 1992. Dr. Frank Dame, the children's treating clinical psychologist, testified concerning the serious emotional damage the children had suffered, and would continue to suffer, if left in Mother's custody. Three DSS workers testified as to the conditions they had witnessed in Mother's home, the efforts of DSS to help remedy the situation, and Mother's lack of effort to correct problems.

The court terminated Mother's parental rights to the children. She appeals.

I. CLEAR AND CONVINCING EVIDENCE SUPPORTS TERMINATION OF MOTHER'S PARENTAL RIGHTS AS THE LEAST RESTRICTIVE ALTERNATIVE IN THE BEST INTERESTS OF THE CHILDREN.

■ We apply the clearly erroneous standard of review to a trial court's findings of fact. *In re E.D.J.*, 499 N.W.2d 130, 134 (S.D.1993); *In re A.M.*, 292 N.W.2d 103, 105

(S.D.1980). The party claiming error bears the burden of establishing the findings are in error. *In re K.A.B.E.*, 325 N.W.2d 840, 844 (S.D.1982); *A.M.*, 292 N.W.2d at 105. Termination of parental rights must be supported by clear and convincing evidence that it is the least restrictive alternative commensurate with the best interests of the child. *E.D.J.*, 499 N.W.2d at 135; *In re K.C.*, 414 N.W.2d 616, 620 (S.D.1987). The least restrictive alternative is viewed from the child's point of view, not the parent's. *E.D.J.*, 499 N.W.2d at 135; *In re S.W.*, 398 N.W.2d 136, 139 (S.D.1986).

■ Mother's neglect of the children is well documented in the record. The children were routinely left home alone. The older children were frequently left to baby-sit younger siblings; for example, it was the responsibility of 11–year–old C.H. to care for baby C.O. when Mother worked all night. There was testimony the oldest siblings had physically abused the younger children.

Mother often failed to prepare meals for the children. Frequently there was inadequate food in the house. There was testimony that on one occasion the younger children were afraid to eat the only food in the house, a loaf of bread, for fear the oldest sibling would punish them.

Mother failed to keep the home at a minimal standard of cleanliness. Evidence showed a filthy refrigerator which contained rotted food. The floor was strewn with cigarette butts, soiled clothing and used diapers. A rodent was seen crawling out of a pile of dirty clothing. The plumbing was frequently broken and Mother failed to notify the landlord. The home was periodically unheated when fuel was depleted.

There was inadequate attention to the physical and medical needs of the children. Mother failed to get them immunized. They were repeatedly sent home from school because of head lice. The younger children came to school in clothing with dried feces on

---

**3.** Apparently Mother also avoided her own attorney. She missed all scheduled appointments and despite numerous letters and telephone calls re-

questing she contact the attorney, she never did so.

it. She failed to insure that the child with epilepsy received prescribed medication. She failed to obtain needed eyeglasses for one child.

The educational needs of the children were also neglected. Mother often failed to send the children to school. Evidence was presented that at one time teachers would come to the home, wake the children, and take them to school. Recommendations for special education or summer programs were not followed.

Over the years, DSS provided numerous services to Mother to correct problems in the home, but she repeatedly neglected to remedy problems. Home-based, one-on-one support services were provided to her. There were six case service plans between March 31, 1989, and July 5, 1991, none of which were completed. She was offered help to plan meals, budget money, obtain food stamps, and apply for energy and housing assistance. Mother would briefly cooperate and then fail to follow through.

Dr. Frank Dame testified at the December 1, 1992, dispositional hearing that the children had been evaluated and were receiving weekly therapy. Dr. Dame's diagnosis was that all the children had suffered emotional damage due to their home environment. Although the children's emotional problems varied in degree, they exhibited personality disorders characterized by frustration, aggressive behavior, lack of attachment, depression, resentment at having to assume parental responsibilities, emotional withdrawal, competitiveness and immaturity.

Dr. Dame evaluated Mother in 1990.[4] He diagnosed her as a person of average intelligence with a personality disorder dominated by schizoid tendencies resulting in lack of attachment and depression. His opinion was that Mother did not think through the consequences of her actions, was unresponsive to the needs of others, impulsive and sought

instant gratification for herself. He characterized her style of child rearing as one of detachment, leaving the children to care for themselves and "whatever happens happens." Dr. Dame recommended termination of parental rights as the only alternative in the best interests of the children.

Kimberly Kusler, a Native American DSS worker, testified concerning the problems with Mother's neglect and its effect on the children. She chronicled DSS's repeated and futile efforts to help Mother meet the needs of the children.

Joyce Panzer, a DSS worker, testified as to Mother's failure to cooperate with case service plans from 1989 through 1991. Panzer stated Mother's motivation to improve parenting skills was minimal; it "just didn't appear that she was interested in doing anything." She testified as to Mother's lack of communication with and control over the children.

Melita Rank, another Native American DSS worker, testified regarding Mother's failure to attend visits with the children after they had been removed from her custody. She testified as to Mother's unresponsiveness to all the programs and help offered to her by DSS.

In spite of its determination that the Indian Child Welfare Act (ICWA) was not applicable to the children, the trial court's judgment expressly states that it applied the "beyond a reasonable doubt" standard to its findings of fact. *K.A.B.E.*, 325 N.W.2d at 843; *In re J.L.H.*, 299 N.W.2d 812, 814 (S.D. 1980). The facts of this case reveal overwhelming evidence of inadequate supervision and neglect of the most basic needs of these children. Mother has absolutely failed to carry her burden of establishing the findings of fact are clearly erroneous and not supported by the evidence. There is clear and convincing evidence that termination of Mother's parental rights is the least restrictive alternative commensurate with the best interests of these children.

4. Mother failed to keep her court-ordered appointment for a subsequent evaluation in 1992.

II. THE CIRCUIT COURT ERRED IN ALLOWING TERMINATION OF PARENTAL RIGHTS TO PROCEED WHERE THE STATE FAILED TO GIVE ADEQUATE NOTICE UNDER 25 U.S.C.S. § 1912(a) TO DETERMINE WHETHER THE CHILDREN WERE INDIAN CHILDREN UNDER 25 U.S.C.S. § 1903(4).

■ The provisions of ICWA must be followed in proceedings involving the termination of parental rights over Indian children. 25 U.S.C.S. §§ 1901 et seq. (Law.Co-op.1983) ICWA requires in part:

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. *If the identity or location of* the parent or Indian custodian and *the tribe cannot be determined, such notice shall be given to the Secretary* in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe.[5] (Emphasis added.)

25 U.S.C.S. § 1912(a) (Law.Co-op.1983). This court has determined that failure to comply with the notice provision deprives a court of jurisdiction to terminate parental rights to Indian children. *K.A.B.E.*, 325 N.W.2d at 842; *In re N.A.H.*, 418 N.W.2d 310, 311 (S.D.1988). Violation of the notice provisions may be cause for invalidation of the proceedings. 25 U.S.C.S. § 1914 (Law. Co-op.1983).

■ The trial court must initially determine if a child is an Indian child within the meaning of ICWA. *K.A.B.E.*, 325 N.W.2d at 842; *In re C.R.M.*, 307 N.W.2d 131, 132 (S.D.1981).

"Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]

25 U.S.C.S. § 1903(4) (Law.Co-op.1983). Mother claims she is one-half Choctaw Indian. She admitted at the dispositional hearing that she is not an enrolled member of any Indian tribe. However, a parent's current enrollment is not always dispositive of a child's membership in an Indian tribe. *In re H.D.*, 11 Kan.App.2d 531, 729 P.2d 1234, 1238 (1986) (reversing for failure to notify tribe and Secretary where Mother enrolled in tribe six weeks after termination of her parental rights); *cf. In re A.L.*, 442 N.W.2d 233, 237–38 (S.D.1989) ((Wuest, C.J., concurring specially) (expressing that it is unnecessary to hold this court is bound by a tribal determination that a Caucasian child is an Indian) (Miller, Sabers, J.J., concurring specially) (stating that where tribal enrollment was clearly based on mistake or fraud, this court need not recognize enrollment)).

■ In this case, the original petition filed by DSS declares: "It appears the Indian Child Welfare Act may be applicable for the following reasons: [Mother] is believed to be one-half Choctaw, a tribe federally recognized in Mississippi. Therefore, she and/or the children may be eligible for enrollment with that tribe." DSS personally served Mother with the petition.[6] DSS also mailed the petition to the Mississippi Branch of the Choctaw Indians by registered mail, return receipt requested. Thus, notice was sufficient to Mother and the Mississippi Band of Choctaw Indians.

■ A letter was subsequently received by DSS from the Mississippi Band of the Choctaw Indians stating it could find no information concerning Mother or the children in the enrollment records of the tribe. It suggested contacting the Choctaw Nation of Oklahoma. Apparently DSS did so, as a subsequent letter from the Choctaw Nation

---

5. "Secretary" is the Secretary of the Interior as defined in 25 U.S.C.S. § 1903(11) (Law.Co-op. 1983).

6. Personal service, in lieu of service by registered mail, return receipt requested, is acceptable under the Guidelines for State Courts, 44 Fed.Reg. 67,588 (1979).

of Oklahoma states it was "unable to find any evidence of tribal enrollment" for Mother or children.[7] However, the record shows no proof that DSS served the Oklahoma tribe by registered, return receipt mail. Thus, notice to the Choctaw Nation of Oklahoma was insufficient under ICWA.

■ Further, where there is reason to know an Indian child may be involved and where the identity of the tribe cannot be determined, notice must be given to the Secretary of the Interior. 25 U.S.C.S. § 1912(a). There is no evidence in the record that the required notice was given to the Secretary.

■ A major purpose of ICWA is to protect "Indian children who are members of or are eligible for membership in an Indian tribe[.]" 25 U.S.C.S. § 1901(3). To this end, the Indian child's tribe has the right to intervene in state court at any point in the proceedings. 25 U.S.C.S. § 1911(c) (Law.Co-op.1983). However, a tribe's right to intervene is meaningless without notice of the proceedings. *In re Junious M.*, 144 Cal. App.3d 786, 790, 193 Cal.Rptr. 40, 42 (1983); Russel Barsh, *The Indian Child Welfare Act of 1978: A Critical Analysis*, 31 Hastings L.J. 1287, 1313 (1980). We find that error occurred when no notice was given to the Secretary of the Interior and when inadequate notice was given to the Choctaw Nation of Oklahoma.

■ We are not the first court to face the question of how to proceed when there is uncertainty as to whether ICWA is applicable and there has been lack of adequate notice to required parties under ICWA. The Supreme Court of Vermont concluded that a trial court had erred in terminating parental rights where no notice of the proceeding was given to the Mohawk Indian Tribe. *In re M.C.P.*, 153 Vt. 275, 571 A.2d 627 (1989). The Vermont Court remanded for adequate

notice with instructions that if, on remand, it was determined ICWA did not apply, the original trial court order of termination would stand. *Id.* 571 A.2d at 635.

Similarly, a Washington appellate court remanded for determination of a child's Indian status after it found the state had failed to give proper notice to the Apache Tribe or the Bureau of Indian Affairs. *In re Dependency of Colnar*, 52 Wash.App. 37, 757 P.2d 534, 536–37 (1988). When the trial court subsequently determined the child was neither enrolled nor enrollable in an Indian tribe, the appeals court affirmed the trial court's termination of parental rights. *Id.* 757 P.2d at 537.

In a similar case, a California appeals court found the trial court had erred in failing to inform the Nooksack Indian Tribe of an action concerning a child alleged to be Indian. However, the appellate court conditionally affirmed the trial court's order terminating parental rights if, on remand, the child was not determined to be an Indian child as defined by ICWA. *Junious M.*, 193 Cal.Rptr. at 44–47.

We agree with the procedure adopted by the aforementioned courts when there has been inadequate notice to determine whether ICWA is applicable. Therefore, we remand to the trial court with instructions to direct the DSS to notify, by registered, return receipt mail, both the Choctaw Nation of Oklahoma and the Secretary of Interior of the termination of parental rights proceeding concerning these children. The dispositional order of December 17, 1992, shall remain in effect until the trial court makes further findings concerning the status of these children. If the trial court subsequently determines that either (1) the minor children are members of a tribe, or (2) the minor children are eligible for membership and Mother is a member, the judgment of the trial court is reversed and it shall proceed in accord with

---

7. It is our opinion the DSS made a good faith effort to comply with ICWA considering the min-imal amount of information provided by Mother.

all provisions of ICWA. If however, it determines that (1) the minor children are not members of a tribe, and (2) the minor children are not eligible for membership or Mother is not a member, the judgment entered December 17, 1992, is affirmed.[8]

WUEST, HENDERSON, SABERS and AMUNDSON, JJ., concur.

---

8.  25 U.S.C.S. § 1912(a) (Law.Co-op.1983) provides in part:

> No foster care placement or termination of parental rights proceedings shall be held until at least ten days after receipt of notice by the parent or Indian custodian or the tribe or the Secretary: Provided, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

In light of our remand to the trial court to determine the Indian status of the children, we will not address Mother's claim that the trial court erréd in denying her motion for a twenty-day continuance of the dispositional hearing as provided by ICWA. We note that Mother was personally served notice on August 12, 1992, of the scheduled November 10, 1992, dispositional hearing. The final hearing was not held until December 1, 1992.