#23990-a-SLZ

**2007 SD 14**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE INTEREST OF D.F.
Alleged Abused or Neglected
Child and concerning
L.A., f/k/a L.D.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
DAVISON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE LEE D. ANDERSON
Judge

\* \* \* \*

DREW DUNCAN of
Zimmer, Duncan & Cole, LLP
Parker, South Dakota                    Attorneys for Mother, L.A.


LAWRENCE E. LONG
Attorney General

KIRSTEN E. JASPER
Assistant Attorney General
Division of Legal Services
Department of Social Services
Pierre, South Dakota                    Attorneys for appellee State.

\* \* \* \*

CONSIDERED ON BRIEFS
ON OCTOBER 2, 2006

OPINION FILED **01/24/07**

#23990

ZINTER, Justice.

[¶1.]        Mother's and Father's parental rights were terminated in an abuse and neglect proceeding. Mother was served by publication and failed to appear at any of the hearings.[1] She subsequently moved to reopen, challenging the State's due diligence in attempting to locate her before the service by publication. She also challenged the circuit court's refusal to reopen to redetermine her parental fitness. The circuit court denied relief. We affirm.

[¶2.]        D.F. was born on October 22, 1994, in Illinois. When D.F. was less than a year old, Mother brought him and his sister (born August 5, 1995) to visit Father who was staying with his mother (Grandmother) in Arkansas. After a violent marital disagreement and Mother's arrest on an Arkansas traffic offense, Mother left Arkansas, abandoning D.F. and his sister with Father and Grandmother. Mother returned to her parents' home in Illinois.

[¶3.]        Father was subsequently granted a divorce from Mother in Arkansas. At all relevant times thereafter, D.F. resided with Father, and D.F.'s sister resided with Father or Grandmother. All four moved to South Dakota in 1999, but Grandmother and Father maintained separate households. It appears that D.F. resided with Father and his sister resided with Grandmother.

[¶4.]        Mother moved often after leaving Arkansas in 1995. She moved from her parents' home in Illinois to Las Vegas, then back to Illinois. She next moved to South Carolina and then to Ohio. Mother then stayed with her parents in Florida,

---

1.     Father received personal notice of the proceedings, appeared, and does not appeal.

before moving to Arizona. Then, she moved to Las Vegas where she remarried. Thereafter, Mother and her new husband moved to Florida. Mother did not maintain contact with the children or their custodians prior to this abuse and neglect proceeding, which was commenced in 2002.

[¶5.] The Department of Social Services (DSS) brought this action based upon an allegation that D.F. was abused and neglected by Father and Father's new wife. Temporary custody of D.F. was placed with Grandmother. Father was personally served and appeared at multiple hearings. Mother could not be located and was served by publication pursuant to SDCL 26-7A-48.[2] She did not appear at any of the proceedings. The circuit court terminated Father's and Mother's parental rights on November 7, 2002. That decision was not appealed.

[¶6.] On May 21, 2004, Mother moved to reopen the termination proceedings under SDCL 15-6-60(b)(6). The circuit court initially granted the motion. However,

2. SDCL 26-7A-48 provides in part:

> If the petition or an affidavit of the state's attorney discloses that any person or party to be served with the summons is out of the state, on inquiry cannot be found, is concealed within the state, resides out of the state, whose mail at the last known address has been returned, whose location is unknown or is affected by the designation "All Whom It May Concern," the court shall cause the summons, modified to declare the initials of the child in lieu of the name of the child, to be published once in a newspaper of general circulation published in the county where the action is pending or in a newspaper in another county designated by the court as most likely to give notice to the party to be served. Publication of the summons shall be made not less than five days before the date of the hearing on the petition. Notice given by the publication is the only required notice to the concerned persons or parties to be served who are described in this section. An affidavit or certificate of publication made by the concerned newspaper and accepted by the court is evidence of service of summons by publication.

the State moved to quash the order allowing the reopening. The State contended that SDCL 26-7A-108 prohibited modification of final judgments terminating parental rights in abuse and neglect cases. The State's motion to quash was granted. Mother appeals, raising two issues.

1.   Whether the State failed to use due diligence in locating Mother prior to service by publication in violation of Mother's right to due process.

2.   Whether the circuit court erred in denying the motion to reopen under SDCL 26-7A-108.

*Due Diligence*

[¶7.]   Mother argues that due process precluded the termination of her parental rights without a showing that the State used due diligence in attempting to locate her before service by publication. Because "the validity of service of process is a question of law, 'we review the trial court's decision de novo, with no deference given to the trial court's legal conclusions.'" Lekanidis v. Bendetti, 2000 SD 86, ¶15, 613 NW2d 542, 545 (quoting Yankton Ethanol, Inc. v. Vironment, Inc., 1999 SD 42, ¶6, 592 NW2d 596, 598 (citations omitted)). "'We [also] review constitutional questions *de novo*.'" Medearis v. Whiting, 2005 SD 42, ¶14, 695 NW2d 226, 230 (quoting State v. Aesoph, 2002 SD 71, ¶43, 647 NW2d 743, 757).

[¶8.]   "At the outset, it is to be noted that the use of constructive [service] for in personam actions is not a per se violation of due process under the Fourteenth Amendment." United Nat. Bank v. Searles, 331 NW2d 288, 291 (SD 1983) (citing Mullane v. Central Hanover Bank & Trust Co., 339 US 306, 70 SCt 652, 94 LEd 865 (1950)). "Dispositive of the due process issue is a determination of whether or not the service of process was reasonably calculated under the circumstances to apprise

interested parties of the pendency of an action against them." *Id*. at 290 (citing

*Mullane*, 339 US at 314, 70 SCt at 657, 94 LEd at 873).  Therefore, "[s]ervice by

publication is permitted upon a party who is out of state and who 'on inquiry cannot

be found.'" *People in Interest of* E.D.J., 499 NW2d 130, 132 (SD 1993) (quoting

SDCL 26-7A-48; *In re* J.W.W., 334 NW2d 513, 516 (SD 1983)).

[¶9.]      However, "before service by publication . . . may be ordered, the party

instituting the litigation must exhaust all reasonable means available in an effort to

locate interested parties to the litigation."  Nolan v. Nolan, 490 NW2d 517, 520 (SD

1992) (citing Ryken v. State, 305 NW2d 393 (SD 1981)).  *See also, In Interest of*

*E.D.J.*, 499 NW2d at 132 (stating that the record supported a finding that the

state's efforts to locate parents were "due and diligent" in a parental rights

termination proceeding).  Ultimately, "[t]he test of the sufficiency of the showing of

due diligence is not whether all possible or conceivable means of discovery are used,

but rather it must be shown that all reasonable means have been exhausted in an

effort to locate interested parties." *Ryken*, 305 NW2d at 395 (citations omitted).

Therefore:

> A diligent search is measured not by the quantity of the search
> but the quality of the search.  In determining whether a search
> is diligent, we look at the attempts made to locate the missing
> person or entity to see if attempts are made through channels
> expected to render the missing identity.  While a reasonable
> search does not require the use of all possible or conceivable
> means of discovery, it is an inquiry that a reasonable person
> would make, and it must extend to places where information is
> likely to be obtained and to persons who, in the ordinary course
> of events, would be likely to have information of the person or
> entity sought.

*In re* S.P., 672 NW2d 842, 846 (Iowa 2003). "Whether a party has exhausted all reasonable means available for locating interested parties must be determined by the circumstances of each particular case." *Ryken*, 305 NW2d at 395 (citation omitted).

[¶10.] Although Mother contends that all reasonable means were not utilized, she relies upon clearly distinguishable authority. For example, in *In Interest of A.W.*, 224 Neb 764, 401 NW2d 477 (1987), termination was sought following a mother's abandonment of her son who had been left with his grandmother. Although the mother was served by publication, no near relatives, not even the grandmother who had custody, were questioned about the mother's location. Furthermore, the grandmother and another social services worker knew the mother's location, yet they were not specifically questioned. Similarly, in *In re S.P.*, a father's parental rights were terminated without personal service, but:

> the search [for father] did not include the obvious inquiries a reasonable person would make under the circumstances. For example, the investigator did not talk to the children or their caretaker . . . or to the children's mother. These are the people who, in the ordinary course of events, would likely have information about [father].

672 NW2d at 848. Because no efforts were made to inquire of the available relatives, the children, or their caretakers, those courts understandably concluded that due diligence was not exercised.

[¶11.] In contrast, Nathan Schlimgen, D.F.'s Department of Social Services worker, testified that he made the reasonable inquiries that were not made in *In Interest of A.W.* or *In re S.P.* Specifically, Schlimgen unsuccessfully inquired of

Father concerning Mother's location, Mother's parents' location, or collateral relatives who might be able to contact Mother. He testified:

> Q. Did you know where she was?
> A. No, I did not.
> Q. Did you inquire of [Father] of her whereabouts?
> A. Yes.
> Q. Do you recall if he was able to give you an answer?
> A. I believe his answer was that he did not know where she was.
> Q. Was he able to provide information as to how to contact her parents who could get a hold of her?
> A. No, I don't believe so.
> Q. And, is it a fair statement to say that in a serious matter such as the termination of parental rights, you also ask for collateral relatives who might be able to get a hold of a parent whose parental rights may be terminated?
> A. Yes.
> Q. And [Father] was unable to give you that?
> A. Correct.

Schlimgen further testified that he checked with the state child support enforcement agency to try to locate Mother, but that search turned up nothing.[3]

[¶12.]    "[A] court must be satisfied, before it exercises its discretion to order service by publication, that a plaintiff has used due diligence in the attempt to locate and personally serve a defendant." Spade v. Branum, 2002 SD 43, ¶11, 643 NW2d 765, 769. In performing that duty, the circuit court also made a personal inquiry of Father and Grandmother. The circuit court asked Father and Grandmother, the separate custodians of Mother's young children, the following questions:

> Court: And, the situation then with [Mother], you still don't know her whereabouts?
> Father: No, I don't.

---

3.    DSS has a statutory mandate to maintain certain information to assist in enforcing child support obligations. *See* SDCL 25-7A-3.3.

> Court: The mother; you wouldn't know how to try to contact her?
> Father: No, I wouldn't.
> Court: And, you are here, [Grandmother]?
> Grandmother: Yes.
> Court: You don't know how to contact her either?
> Grandmother: No, sir.

Later, in the same hearing, the circuit court again inquired about Mother's contact with D.F. and the location of Mother's parents.

> Court: [Father], may I ask you, when was the last time that [Mother] had any contact with [D.F.]?
> Father: He was about 14 months old, 10 months old.
> Court: How old is he now?
> Father: He is 7.
> Court: So he's not got a card from her?
> Father: No
> Court: No telephone calls from her?
> Father: No.
> Court: He has not heard from her?
> Father: No. When I got full custody, it went through the courts, he asked if I wanted child support. I said, if you can find her, go ahead. . .
> Court: All right. You (Grandmother) don't know where her parents are?
> Grandmother: No, I don't.

Grandmother also told the court that "nobody knows where [Mother is] at." Ultimately, the circuit court found that Mother's "whereabouts and residence cannot be readily ascertained although a diligent search has been made."

[¶13.] This factual finding is supported by the record. Both Schlimgen and the court inquired of Father and Grandmother. Yet these custodians of Mother's young children, the people who would be most likely to know her location, could not provide relevant information concerning Mother's location or the names of other people who might have known Mother's location. Moreover, DSS's inquiry included the State's child support agency for Mother under two different last names. However, available resources could not provide information as to Mother's location,

how to contact her, or even the location of Mother's own parents or other collateral relatives.[4]

[¶14.] Nevertheless, Mother argues that DSS failed to use due diligence because Schlimgen did not search any old addresses, did not look for any other members of Mother's family, did not look at D.F.'s birth certificate for her old address, and did not do an internet search. She also argues that DSS was remiss in not following up on information from Father that Mother might have lived in "Illinois or Chicago." While one can speculate concerning these possible alternatives, it is the quality of the search made in a particular context rather than the quantity that governs a duly diligent search. *In re S.P.*, 672 NW2d at 846. Moreover, Mother has not shown that any of these after-the-fact suggested alternatives would have actually disclosed her location. This is significant because, although she contends further inquiry should have been made concerning the information about "Illinois or Chicago," the record reflects that neither Mother nor her parents lived there at any time during the abuse and neglect proceedings.

[¶15.] Thus, although hindsight may always be used to fashion other conceivable methods of inquiry, this search was diligent because it was an inquiry that a reasonable person would have made, and it extended to the places where

---

4. Concededly, the affidavit in support of service by publication was lacking in specifics and was inadequate to support the order for service by publication. However, this defect is harmless error because the record reflects that further due diligence was exercised and the circuit court personally questioned Father and Grandmother before ordering service by publication.

#23990

information was likely to be obtained.  We therefore conclude that DSS exercised

due diligence.

*Reopening*

[¶16.]     The circuit court initially granted the motion to reopen based on SDCL

15-6-60(b)(6).[5]   However, the court later quashed the order concluding that SDCL

15-6-60(b) was inapplicable and SDCL 26-7A-108[6] controlled.  The former provision

is a court rule and the latter provision is a legislative enactment.  Although the

former provision generally allows the reopening of certain judgments, the latter

provision specifically prohibits the reopening of judgments terminating parental

rights.  We acknowledge the different language used in these provisions.  However,

---

5.   SDCL 15-6-60(b) provides in part:

> On motion and upon such terms as are just, the court may relieve a party or
> his legal representative from a final judgment, order, or proceeding for the
> following reasons:  . . .  (6) Any other reason justifying relief from the
> operation of the judgment.

6.     SDCL 26-7A-108 provides in relevant part:  "The court may modify or set
aside any order or decree made by it, except a decree terminating parental
rights."

Mother contends that an exception to this prohibition was recognized in
*Matter of F.J.F.*, 312 NW2d 718 (SD 1981).  There, a petitioner sought to
reopen a dependency and neglect proceeding in order to establish paternity.
Blood evidence of paternity was admitted under SDCL 26-8-63 (now *see*
SDCL 26-7A-110), which specifically allowed a new hearing based on new
evidence.  This Court concluded "from the peculiar circumstances of this case
that the trial court did not err in ordering a new hearing pursuant to SDCL
26-8-63. . . ." *Id.* at 721.  However, the Court's analysis was obviously
grounded on different statutes.  Furthermore, as explained *infra,* ¶¶17-18
Mother's underlying basis for her "peculiar circumstances" argument
ultimately fails.  Therefore, we decline to address the "exception" issue.

-9-

we need not interpret them in this case because Mother's underlying basis for relief fails under both provisions.

[¶17.] Mother's basis for relief under both provisions is an alleged failure to use due diligence in locating her before service by publication. However, Mother lived a nomadic lifestyle, failed to maintain any contact with her children or their custodians for many years, and an unsuccessful but diligent inquiry was made of the people most likely to know of her whereabouts. Because a lack of due diligence is necessary for relief under either provision, and because a lack of due diligence is not present in this case, we find no error in the circuit court's refusal to reopen.

[¶18.] Affirmed.

[¶19.] GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, concur.

[¶20.] SABERS, Justice, dissents.


SABERS, Justice (dissenting).

[¶21.] I write specially to point out that the State's efforts to locate Mother do not constitute "due diligence." As indicated in the majority opinion, "before service by publication . . . may be ordered the party instituting the litigation must exhaust all reasonable means available in an effort to locate interested parties to the litigation." Nolan v. Nolan, 490 NW2d 517, 520 (citing Ryken v. State, 305 NW2d 393, 395 (SD 1981)). *See also* In the Interest of E.D.J., 499 NW2d at 132 n9. I agree with Mother that the State did not search any old addresses, did not look for

any other members of *Mother's* family, did not look at D.F.'s birth certificate for her old address and did not do an internet search.

[¶22.]     The majority opinion discards these claimed "after-the-fact suggested alternatives" because Mother has not shown that they would have disclosed her location.  Even if that were so, that is not the test for "due diligence" as stated above and I dissent.