2002 SD 71

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**David George AESOPH, Defendant and Appellant.**

**Nos. 21872, 21887.**

Supreme Court of South Dakota.

Argued March 28, 2002.

Decided June 19, 2002.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, for plaintiff and appellee.

Reed Rasmussen, Jeffrey Sveen of Siegel, Barnett and Schutz, Aberdeen, for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.] David Aesoph (Aesoph) was charged with first degree murder and alternate counts of second degree murder and first degree manslaughter for the November 18, 1999 death of his wife. On October 5, 2000, the jury found him guilty of first degree murder. Aesoph was sentenced to life imprisonment on November 8, 2000. Aesoph now appeals, raising issues regarding: (1) the nature of the interviews with investigators; (2) the admission of expert testimony; (3) the admission of prior statements of the victim; (4) the selection of jurors; (5) the use of a jury instruction on concealment; (6) the denial of his motion for new trial; and (7) the revocation of his bond. We affirm.

**FACTS AND PROCEDURE**

[¶ 2.] Aesoph and his wife, Tania, were married in October 1975. By 1994, amidst allegations of physical, verbal and mental abuse, Tania sought the help of attorney Lee Burd (Burd) to begin divorce proceedings. But Tania indicated to several people that she feared Aesoph would kill her and make her death look like an accident if she were to get a divorce. Aesoph told a number of people that he wanted to kill Tania. Tania dropped the 1994 plans to divorce Aesoph and moved back to their farm outside Highmore, South Dakota.

[¶ 3.] By the fall of 1999, however, the marriage had deteriorated to the point where Tania was again planning to divorce Aesoph. The 50–year–old mother of five children bought her own car in October 1999 and began secretly moving her personal belongings to a friend's house. On November 7, 1999, Tania and her youngest child, 16–year–old J.A., left the farm while Aesoph was sleeping and moved to an apartment in Faulkton, South Dakota. On November 16, 1999, she again contacted Burd to reinstate divorce proceedings.

[¶ 4.] Unknown to Tania at the time, Aesoph had two life insurance policies on his wife totaling $1.7 million which were payable to him in the event of her death by accident. He obtained the second policy by telling the agent that he wished to cancel the first policy on Tania in favor of a cheaper one. Aesoph, however, never cancelled the first policy and continued to make payments on both. He also added an accidental death rider to the first policy.[1] On November 12, 1999, Aesoph called the insurance agent who sold him the policy and informed him about Tania's plans for divorce. Aesoph told the agent "I'm going to kill the bitch." He also told the agent to "remember that she was the one that wanted the life insurance."

[¶ 5.] On November 18, 1999, the day of Tania's death, Tania and Aesoph met with a Court Services Officer in Highmore, to discuss their son's juvenile case. Next, Tania made a deposit at the bank and went with Aesoph to meet an attorney in Highmore to discuss divorce proceedings.[2] Hyde County Sheriff, Michael Volek, observed Aesoph and Tania in a pickup headed back to the family farm at about 11:10 a.m. Once they reached the house, the

---

1. Aesoph was the owner and beneficiary of a $500,000 policy, dated April 6, 1994, with a $500,000 accidental death benefit added on December 6, 1996. Aesoph was also the owner and beneficiary of a $500,000 policy with a $200,000 accidental death benefit dated June 21, 1996.

2. Aesoph had also been in contact with attorney Jeffrey Sveen, who represents Aesoph in this action. Aesoph called Sveen no less than thirteen times in the week preceding Tania's death.

two telephoned their eldest daughter, who was a foreign exchange student in Italy. This call lasted from 11:43 to 11:55 a.m. Aesoph called Greenline Implement in Miller at about 1:08 p.m. and picked up a radiator cap one hour later. At 3:01 p.m., Aesoph contacted the former Hyde County Sheriff to tell him that Tania had fallen down the stairs and was dead. He also called Volek at 3:16 p.m. and informed him that Tania was dead.

[¶ 6.] Volek was the first to arrive at the farmhouse at about 3:55 p.m. and found Aesoph coming out of the bathroom. Aesoph told Volek that he had moved Tania's body so that the kids would not see her and he was washing her blood off his hands. Volek discovered a washing machine with Aesoph's work coat inside and a dryer containing a pair of jeans, mismatched work gloves, underwear, shirts, socks and a towel. When Volek turned off the washing machine and asked Aesoph who had started it, Aesoph turned the machine back on, claiming it must have been started by someone else. Volek did not immediately pursue the issue.

[¶ 7.] Other law enforcement personnel and family members began arriving early that evening. Department of Criminal Investigation (DCI) Agents Jerry Lindberg (Lindberg), Brian Zeeb (Zeeb) and Mike Braley (Braley) arrived shortly after 5 p.m. State Crime Lab personnel, including Coroner Mike Luze, Lab Director Rex Riis and Criminalist Christine Reitsma, arrived at about 7 p.m. Two of Aesoph's adult children also arrived and visited with Aesoph about who would do the farm chores the next morning.

[¶ 8.] The three investigators interviewed Aesoph in the dining room of his farmhouse. Three interviews took place between 5:25 p.m. and 11:16 p.m., the first

lasting about 13 minutes, the second lasting about 45 minutes and the third lasting about 60 minutes. Aesoph was unaccompanied by an attorney and was not given a Miranda warning. Aesoph was arrested at approximately midnight, upon direction of the State's Attorney. After a hearing on November 19, Aesoph was released on $100,000 bond.

[¶ 9.] The State's pathologists determined that the cause of Tania's death had been manual strangulation and blunt force trauma, injuries they believed could not have come from a fall down a flight of carpeted stairs.[3] Crime scene investigators discovered scuffmarks on the garage floor, blood matching Tania's on the lower inside panel of the garage door, a clump of hair matching Tania's under a car parked in the garage, and a tiny amount of tissue (possibly skin) beneath Tania's fingernail that did not match Aesoph's.

[¶ 10.] Aesoph was indicted on March 1, 2000, and charged with first degree murder and alternate counts of second degree murder and first degree manslaughter. Trial commenced on September 18, 2000. Aesoph was convicted on October 5 and sentenced to life imprisonment on November 8, 2000. After sentencing, Aesoph moved for a new trial, which was denied on March 5, 2001. Aesoph now appeals the following issues:

1. Whether the un-Mirandized statements to investigators were custodial and involuntary, were made after a request for counsel, and should, therefore, have been suppressed.

2. Whether the trial court abused its discretion in admitting the expert testimony of Dr. Saami Shaibani.

---

**3.** Tania's body also showed evidence of a multitude of other injuries including a black eye, broken ribs, skull fractures, and other cuts and bruises.

3. Whether the victim's prior statements should have been excluded as hearsay in violation of the confrontation clause.

4. Whether the method of selection of additional jurors amounted to a violation of procedural due process.

5. Whether the trial court erred in including a jury instruction on concealment.

6. Whether the trial court abused its discretion in denying the post-conviction motion for a new trial.

7. Whether the trial court abused its discretion in revoking the pre-trial bond.

## ANALYSIS AND DECISION

[¶ 11.] **1. Whether the un-Mirandized statements to investigators were custodial and involuntary, were made after a request for counsel, and should, therefore, have been suppressed.**

[¶ 12.] Aesoph challenges the trial court's refusal to suppress statements he made to investigators at his home on the day of Tania's death. While he never did confess to the crime, Aesoph claims admission of the statements at trial was prejudicial because he repeatedly changed elements of his story during the three interviews. This issue involves a mixed question of fact and law. "We review a trial court's decision on a motion to suppress under a *de novo* standard." *State v. Frazier*, 2001 SD 19, ¶ 13, 622 N.W.2d 246, 253 (citing *State v. Stanga*, 2000 SD 129,

¶ 8, 617 N.W.2d 486, 488). The underlying circumstances of an interrogation, such as whether the subject is in custody, involve factual determinations reviewed under the clearly-erroneous standard. *State v. Meyer*, 1998 SD 122, ¶ 16, 587 N.W.2d 719, 722–23. But whether the statements made during that interrogation are voluntary "is a legal question, requiring independent judicial review." *Id.* (quoting *Stanga*, 2000 SD 129 at ¶ 8, 617 N.W.2d at 488) (additional citation omitted).

[¶ 13.] **a. Whether Aesoph's interrogation was custodial.**

[¶ 14.] We must first determine whether Aesoph was in custody at the time of questioning, before this Court will engage in a factored analysis of whether Miranda warnings should have been given, whether Aesoph's statements were voluntary, or whether Aesoph's Fifth Amendment right to counsel was violated.[4] *See State v. Red Star*, 2001 SD 54, ¶ 23, 625 N.W.2d 573, 580. The custody determination is pivotal, as it governs the analysis for all remaining issues regarding Aesoph's statements to law enforcement. We make such a determination based upon "how a reasonable man in the suspect's position would have understood his situation." *State v. Anderson*, 2000 SD 45, ¶ 79, 608 N.W.2d 644, 666 (quoting *State v. Herting*, 2000 SD 12, ¶ 13, 604 N.W.2d 863, 866) (additional citations omitted).

[¶ 15.] The objective circumstances surrounding Aesoph's interrogation were not such that a reasonable per-

4. Aesoph claims only that he was denied his right to an attorney and does not specify whether he is referring to his rights under the Fifth or Sixth Amendment. We assume Aesoph is not claiming a violation of his Sixth Amendment right to an attorney because such a claim requires that the defendant be charged with a crime when denied assistance of counsel. *See State v. Cashman*, 491 N.W.2d 462, 464 (S.D.1992) (citing *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988)). Aesoph does not dispute that he was not under criminal charges at the time he gave the incriminating statements to police. Therefore, we address only the Fifth Amendment issue.

son would believe that he was deprived of his right to freedom. The questioning took place in Aesoph's own dining room, a familiar setting of Aesoph's own choosing. The officers took no verbal or physical action to restrain Aesoph's movement. He was allowed to go, unaccompanied, throughout the house as long as he did not interfere with the crime scene. He was allowed to take bathroom breaks, smoking breaks and coffee breaks at will. Aesoph's family members came and went. Even at the completion of the three interviews, the officers told Aesoph he was not under arrest and would not be placed under arrest until the state's attorney made the decision to do so. Reviewing the evidence, as we must, in a light most favorable to the trial court's decision, we conclude that Aesoph was not in custody when he made the incriminating statements.

[¶ 16.] **b. Whether the absence of a Miranda warning renders Aesoph's statements inadmissible.**

[¶ 17.] There is no dispute that Aesoph was not read a Miranda warning before his interviews with investigators. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Miranda warnings, however, are not required in the absence of custodial interrogation. *Anderson*, 2000 SD 45 at ¶ 75, 608 N.W.2d at 665 (citing *Herting*, 2000 SD 12 at ¶ 8, 604 N.W.2d at 864 (additional citation omitted)).

[P]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'

*State v. Thompson*, 1997 SD 15, ¶ 23, 560 N.W.2d 535, 540 (citation omitted). Because we find the questioning was non-custodial, there is no Miranda violation.

[¶ 18.] **c. Whether Aesoph's equivocal references to his attorney are sufficient to invoke his Fifth Amendment rights.**

[¶ 19.] Aesoph argues that his statements should have been suppressed because they were given after his request for an attorney. Aesoph urges this Court to reject the United States Supreme Court opinion in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), which holds that an ambiguous or equivocal reference to an attorney, when it may reasonably be understood that the suspect only "might" be invoking a right to counsel, is not sufficient to stop questioning. Instead, Aesoph asks this Court to adopt a "stop and clarify" rule. *See, e.g., Steckel v. State*, 711 A.2d 5 (Del.1998); *State v. Chew*, 150 N.J. 30, 695 A.2d 1301 (1997); *State v. Hoey*, 77 Hawai'i 17, 881 P.2d 504 (1994). This issue is not, however, determinative of the outcome of this case.

[¶ 20.] First, the Fifth Amendment right to counsel is grounded in the protection from self-incrimination and the need to be assisted in the *custodial* interrogation process. *Anderson*, 2000 SD 45 at ¶ 74, 608 N.W.2d at 665 (citations omitted). The Supreme Court explained in *Davis:*

[W]e held in *Miranda v. Arizona*, 384 U.S. 436, 469–473, 86 S.Ct. 1602, 1625–1627, 16 L.Ed.2d 694 (1966), that a suspect subject to *custodial* interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before ques-

tioning begins. The right to counsel established in *Miranda* was one of a "series of recommended 'procedural safeguards' ... [that] were not themselves rights protected by the Constitution but were instead measures to insure that the [Fifth Amendment] right against compulsory self-incrimination was protected."

512 U.S. at 457, 114 S.Ct. at 2354, 129 L.Ed.2d at 370. Thus, there is no constitutional right to an attorney when the interrogation is non-custodial.[5]

■ [¶ 21.] Second, even if we were to consider this a valid claim, Aesoph has admitted that he was not denied counsel. At the end of the final interview, investigators asked him, "Do you want an attorney?" Aesoph replied, "I can answer on my own," meaning without an attorney. Then investigators asked him, "Have you ever been denied an attorney through this whole process?" Aesoph replied, "No." Aesoph was no stranger to the process of contacting an attorney. As noted before, he had been in contact with his attorney no less that thirteen times in the seven days preceding his wife's death. On the very day of her death, Aesoph and Tania had consulted another attorney regarding their divorce. Aesoph cannot now objectively establish that his equivocal hints at contacting an attorney somehow invoked his Fifth Amendment right to counsel. *See Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371.

[¶ 22.] Finally, Aesoph correctly recognizes that in order to consider his claim, this Court must reject *Davis* in favor of a "stop and clarify" rule. But Aesoph also argues that this Court has already done so in the case of *State v. Cody*, 293 N.W.2d 440 (S.D.1980). Aesoph's brief states, "In *Cody*, the Court held that an interviewer should, when faced with an equivocal request for an attorney, 'make further inquiry to clarify the suspect's wishes.'" *Cody*, however, says only that it is *permissible* for an investigator to stop and clarify, not that such is *required*. *Id.* at 446 (citation omitted). We also note that this decision predates the Supreme Court's decision in *Davis*. We are not prepared to reject the clear safeguards of *Davis* in favor of a "stop and clarify" rule under the facts of this case.

■ [¶ 23.] Furthermore, the audio tapes and transcripts of the interviews, notwithstanding later testimony by investigators regarding their general interrogation techniques, do not support Aesoph's allegations that he was "talked out of" his desire to contact an attorney. The first time Aesoph mentioned an attorney was well into the third interview when he said, "If you're accusing me here, maybe I should call my lawyer." Braley responded, "You can make that determination if you want to."[6] Then Aesoph asked, "Don't you think that I should talk to an attorney?" Braley responded, "I can't advise you of that." Later in the third interview, Aesoph said, "I am afraid to admit

---

**5.** Even if we were to hold that Aesoph's interrogation was custodial, we need not decide this issue. The absence of a Miranda warning in that instance would mandate suppression of these statements, regardless of any request or denial of an attorney.

**6.** Braley admitted at trial that he may have attempted to dissuade Aesoph from getting an attorney by telling him that, in contacting an attorney, "You shut off your opportunity to

tell us the truth." In a non-custodial interview this is constitutionally permissible. However, if the request for an attorney is in a custodial setting and unequivocal, such "interview techniques" are in violation of *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371 (citations omitted). An unequivocal request is not subject to a subsequent negotiating session with the interrogating officer.

anything. Maybe I should have an attorney. I am scared to death." Braley responded, "That's your call." The final reference came when investigators were pointing out the inconsistencies in Aesoph's story. He stated, "I should really call Jeff [Sveen], my attorney. I don't know. I really can't. I maybe can add a little bit to it, but I just. I can't." Braley responded, "David, you add something to it. Please, for our sake." Aesoph was near a phone and free to make that call at any point. He was very familiar with the name and the number of the attorney already representing him, as he had called him frequently the week before. In the end, he freely admitted that the investigators "worked very diligently to find out whether [he] wanted an attorney." At trial, Aesoph admitted that he "should have been more adamant" in requesting an attorney. We do not view these exchanges as improper attempts to dissuade Aesoph from getting an attorney. Aesoph was not denied his right to counsel and this suppression claim fails.

[¶ 24.] **d. Whether Aesoph's statements were voluntary.**

[¶ 25.] Aesoph asserts that his statements should have been suppressed because they were involuntary. Incriminating statements are involuntary "if, in light of the totality of the circumstances, the will of the defendant has been overborne by law enforcement." *Frazier*, 2001 SD 19 at ¶ 20, 622 N.W.2d at 255. When this Court reviews whether a defendant's statements were made involuntarily:

[W]e consider the effect the totality of the circumstances had upon the will of the defendant and whether the defendant's will was overborne. The factors we consider in making such a determination include: (1) the defendant's youth; (2) the defendant's lack of education or low intelligence; (3) the absence of any advice to the defendant of his constitutional rights; (4) the length of detention; (5) the repeated and prolonged nature of questioning; and (6) the use of physical punishment such as the deprivation of food or sleep. In reviewing the trial court's finding on voluntariness, we consider the evidence in the light most favorable to the finding.

*Anderson*, 2000 SD 45 at ¶ 80, 608 N.W.2d at 667 (internal citations omitted). "The question is not whether the interrogators' statements were the cause of the confession, but whether those statements were so manipulative or coercive that they deprived [a defendant] of his ability to make an unrestrained, autonomous decision to confess." *State v. Smith*, 1999 SD 83, ¶ 36, 599 N.W.2d 344, 352 (citation omitted) (alteration in original).

[¶ 26.] Aesoph relies on the following evidence for support of his assertion that his statements were involuntary: (1) Aesoph was subjected to questioning over a period of six hours; (2) he was placed under pressure because the scene was continuously dominated by police; (3) the interviewers deceived and intimidated Aesoph by telling him that he was lying because his story did not match what the crime scene investigators had discerned; (4) Aesoph was threatened by investigators when they told him his children would not be able to hear his side of the story; and (5) he was tricked by investigators when they told him they could not make the decision to contact an attorney for him. However, the trial court found that Aesoph was not under arrest, was not in custody, and "was not deprived of his freedom of action in any significant way."

[¶ 27.] Instead, the facts of this case establish that Aesoph willingly participated and fully cooperated in all three interviews. Aesoph is a confident strong-

willed 55–year–old [7] successful farmer. He has had prior experience with law enforcement when he was arrested for DWI in 1998 and convicted of disorderly conduct and resisting arrest earlier that same year. Aesoph remained calm and controlled throughout all three interviews. [8]

[¶ 28.] While it took three interviews spanning a period of six hours to get a consistent story from Aesoph, the actual questioning totaled only two hours. "It is a fact of life for law enforcement that suspected criminals do not often readily volunteer incriminating evidence. It takes time to elicit the facts, explore inconsistencies and arrive at the truth." *Frazier*, 2001 SD 19 at ¶ 23, 622 N.W.2d at 256. At no time did Aesoph request that the questioning stop. As in *Frazier*, there were several breaks during the questioning when Aesoph was allowed to move about his home freely, drink, go to the bathroom, smoke cigarettes and speak with family members. Although several law enforcement personnel were present, most were devoted to cataloguing the crime scene. While he mentioned that he was tired, "there is no evidence that [Aesoph] was so overcome by fatigue or stress as to prevent a voluntary" statement. *Id.* at ¶ 23 (quoting *State v. Ferola*, 518 A.2d 1339, 1346 (R.I.1986)).

[¶ 29.] We consider Aesoph's claim of deception as a factor in the analysis, but we also acknowledge that "police may use some psychological tactics in interrogating a suspect." *State v. Darby*, 1996 SD 127, ¶ 31, 556 N.W.2d 311, 320 (citations omitted). We have held that this type of "on-the-scene questioning" is "absolutely essential for law enforcement officers to perform their jobs well and to investigate possible crimes." *Herting*, 2000 SD 12 at ¶ 10, 604 N.W.2d at 865 (citation omitted). In the end, Aesoph only admitted to having a minor physical altercation with his wife in the garage, but never to killing her. He simply gave multiple versions of how she may have accidentally died. We cannot say that the statements by the investigators in this case were overtly coercive or manipulative.

[¶ 30.] **2. Whether the trial court abused its discretion in admitting the expert testimony of Dr. Saami Shaibani.**

[¶ 31.] Aesoph challenges the admission of Dr. Saami Shaibani's (Shaibani) testimony regarding accident and injury reconstruction. A trial court's admission of expert testimony is controlled by SDCL 19–15–2, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise,

Given the trial court's "broad discretion concerning the admission of expert testimony," its "decision on such matters will not be reversed absent a clear showing of an abuse of discretion." *Nickles v. Schild*, 2000 SD 131, ¶ 7, 617 N.W.2d 659, 661 (citations omitted).

"An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." In applying the

---

7. Aesoph was 53 at the time of questioning.

8. In this case we are not left with pondering the background circumstances of an interview from the cold pages of a transcript. The interviews with Aesoph were tape-recorded. A review of those audio tapes shows he was fully in control of his participation in the interviews.

abuse of discretion standard, "we do not determine whether we would have made a like decision, only whether a judicial mind, considering the law and the facts, could have reached a similar decision." *State v. Fowler*, 1996 SD 78, ¶ 12, 552 N.W.2d 92, 94–5 (quoting *State v. Wilkins*, 536 N.W.2d 97, 99 (S.D.1995) (citations omitted)). Thus, for a reversal on this issue, and any others applying this standard, Aesoph must demonstrate that no "judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *State v. Barber*, 1996 SD 96, ¶ 14, 552 N.W.2d 817, 820.

[¶ 32.] Essentially, Aesoph contends that Shaibani's testimony was without reliable foundation because it was based solely upon a diagram drawn by Braley. This drawing was made from Aesoph's description of how he allegedly found the victim after her fall. But Aesoph maintains that he repeatedly told the investigators that he could not explain how his wife was positioned when he found her.[9] In addition, Aesoph claims that Shaibani's testimony was highly prejudicial because it was based on the subjective beliefs of Braley and Shaibani. We disagree.

[¶ 33.] Shaibani's opinion was based on more than one simple diagram. He testified at trial that he based his opinion upon his experience, forensic findings, physical evidence, autopsy reports and his own observations of the scene. The trial court conducted a *Daubert* hearing and concluded that: (1) Shaibani is qualified in the science of accident and injury reconstruction; (2) the science of

accident and injury reconstruction is reliable, standardized, subject to peer review and widely accepted; (3) the scientific opinion of Shaibani is relevant to show how the victim died and whether that death was the result of an accident. *See State v. Hofer*, 512 N.W.2d 482, 484 (S.D.1994) (adopting the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Shaibani's testimony did not lack foundation. Moreover, Aesoph's testimony eliminated any prejudice that could have come from Shaibani's testimony. Aesoph has failed to show that the trial court abused its discretion. Therefore, we affirm the admission of Shaibani's testimony.

[¶ 34.] **3. Whether the victim's prior statements should have been excluded as hearsay in violation of the confrontation clause.**

[¶ 35.] Prior to her death, the victim made statements to her children, sister-in-law, priest, close friends and co-workers: (1) that she was afraid Aesoph would kill her; (2) that if he killed her he would make her death look like an accident; (3) that she felt threatened by Aesoph; and (4) that Aesoph verbally abused her and shoved her around. The victim also made a statement to the assistant manager at Haar Motors that Aesoph was going to kill her for spending money on a new car. Aesoph contends that these statements should not have been admitted because they were not subject to cross-examination and were, therefore, admitted in violation of the confrontation clause. *See* U.S. Const. amend. VI; SD Const. art. VI § 7. "Evidentiary rulings by the trial

---

9. While Aesoph claims he was unable to describe the victim's position before he moved her, there are several examples to the contrary. Aesoph stated that "She was all piled up. Her neck was twisted under her.... Her head was twisted down under her. Her dress

was over the top of her." He also stated, "Her neck was twisted under her and maybe kinda leaning back a little bit against the, the side wall ... her legs kind of flopped up over her, ya know, to the front."

court are presumed correct and reviewed under an abuse of discretion standard." *State v. Alidani*, 2000 SD 52, ¶ 21, 609 N.W.2d 152, 158.

[¶ 36.] The Sixth Amendment's confrontation clause was designed "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Lilly v. Virginia*, 527 U.S. 116, 123–24, 119 S.Ct. 1887, 1894, 144 L.Ed.2d 117, 126 (1999) (citations omitted). When the declarant is unavailable, the proponent of such hearsay must show certain "indicia of reliability" before the statement may be admitted as evidence.

[¶ 37.] There are two methods of satisfying this reliability threshold. First, " 'indicia of reliability' [are] inferred when 'the evidence falls within a firmly rooted hearsay exception.' " *Frazier*, 2001 SD 19 at ¶ 27, 622 N.W.2d at 257 (quoting *Idaho v. Wright*, 497 U.S. 805, 815, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638, 652 (1990)). Second, the evidence may be admissible with a "showing of particularized guarantees of trustworthiness." *Id.* (quoting *Wright*, 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 655). Such guarantees of trustworthiness are gleaned from the totality of circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* Corroborating evidence, however, may not be used to demonstrate trustworthiness: "the statement must be trustworthy *on its own.*" *Id.* (emphasis in original).

[¶ 38.] The trial court concluded that the victim's statements in this case were both relevant and probative. *See State v. Davi*, 504 N.W.2d 844, 854 (S.D.1993). Accordingly, it admitted the statements under SDCL 19–16–6, the excited utterance exception, SDCL 19–16–7, the state of mind exception, and SDCL 19–16–35, the residual exception.

[¶ 39.] Only one statement was admitted under SDCL 19–16–6, which provides:

> A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, is not excluded by § 19–16–4, even though the declarant is available as a witness.

The statement admitted as an excited utterance was made by Tania to Janine Rathert, the assistant sales manager at Haar Motors in Aberdeen, South Dakota, where Tania bought her car in October 1999. Tania had called, "frantic ... bawling, screaming, and hollering," to see if the dealership had cashed her check yet. "She said her husband was going to kill her because she had spent some money." The court concluded that this statement was "admissible as an excited utterance because it was made in response to a startling event."

[¶ 40.] The remaining statements were admitted under SDCL 19–16–7, which provides:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, is not excluded by § 19–16–4, even though the declarant is available as a witness, but a statement of memory or belief to prove the fact remembered or believed is excluded unless it relates to the execution, revocation, identification, or terms of declarant's will.

The court explained that the evidence, "which describes the emotional, physical, and verbal abusive acts by the Defendant towards the victim and his controlling nature is relevant to show ... the state of mind of both the victim and the Defen-

dant. . . ." Both the excited utterance exception and the state of mind exception are firmly rooted hearsay exceptions. *See White v. Illinois,* 502 U.S. 346, 355 n8, 112 S.Ct. 736, 742, 116 L.Ed.2d 848, 858 (1992); *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597, 608 (1980). Therefore, reliability is presumed and we need not address whether there are particularized guarantees of trustworthiness.[10]

[¶ 41.] First, the victim's statements were properly admitted under firmly rooted exceptions to the hearsay rule. Second, it is well understood that a murder victim's statements, regarding fear of the accused, are admissible to rebut a defendant's claim of accidental death. *Davi,* 504 N.W.2d at 854 (citing *United States v. Brown,* 490 F.2d 758, 766 (D.C.Cir.1973)) (holding statements admissible to rebut defendant's claims of self-defense, suicide, or accidental death). *See also Clay v. Com.,* 262 Va. 253, 546 S.E.2d 728, 730 (2001) (holding victim's statements were admissible under state of mind exception to show gun was not accidentally fired); *State v. Murillo,* 349 N.C. 573, 509 S.E.2d 752, 759–63 (N.C.1998) (holding evidence spanning entire marriage admissible to show death was not accidental); *State v. Richards,* 552 N.W.2d 197, 209 (Minn.1996) (holding victim's statements admissible under state of mind exception to rebut defendant's claim of accident and/or suicide); *State v. Jones,* 137 N.C.App. 221, 527 S.E.2d 700, 704–05 (2000) (holding victim's statements to co-workers admissible to rebut defendant's claim that they had a good marriage). Third, the court appropriately instructed the jury to consider the statements only for the purpose of ascertaining

"whether [the victim's] death was an accident" and not "in determining whether . . . Aesoph is guilty." Therefore, we affirm the trial court's admission of the victim's statements.

[¶ 42.] **4. Whether the method of selection of additional jurors amounted to a violation of procedural due process.**

[¶ 43.] "The trial court has the primary responsibility to make certain that a fair and impartial jury has been selected for a defendant's trial." *State v. Verhoef,* 2001 SD 58, ¶ 12, 627 N.W.2d 437, 440 (citation omitted). In order to show that the trial court has failed in this responsibility, Aesoph must demonstrate that:

> (1) the group excluded is a "distinct" group in the community; (2) the representation of this group in jury pools is not fair and reasonable in relation to the number of such persons in the community; and (3) this under[-]representation is due to the systematic exclusion of the group from the jury selection process.

*State v. Helmer,* 1996 SD 31, ¶ 22, 545 N.W.2d 471, 475 (citations omitted). Aesoph, however, claims there has been a violation of SDCL 16–13–10.2,[11] which automatically amounts to a constitutional due process claim. Aesoph alleges that the method used to contact the additional jurors in this case systematically excluded Native Americans in violation of the jury selection statutes and his right to due process. *See State v. Blem,* 2000 SD 69, ¶ 29, 610 N.W.2d 803, 810 (citations omitted). We review constitutional questions *de novo. State v. Dillon,* 2001 SD 97, ¶ 12,

---

10. We note, however, that the trial court addressed the particularized guarantees of trustworthiness at length and found that there was ample evidence of reliability to support admission of these statements. We agree with this finding.

11. SDCL 16–13–10.2 provides: "No citizen shall be excluded from service as a grand or petit juror in the courts of this state on account of race, color, religion, sex, national origin or economic status."

632 N.W.2d 37, 43 (citing *Stanga*, 2000 SD 129 at ¶ 8, 617 N.W.2d at 488).

[¶ 44.] When the pool of jurors was depleted, the court ordered the Lyman County Sheriff[12] to contact additional prospective jurors pursuant to SDCL 16–13–43, which provides:

> Whenever the panel of petit jurors shall be exhausted by the challenges of either party in any action, the judge of the court shall order the sheriff, deputy sheriff, or coroner to summon, without delay, a sufficient number of persons possessing the qualifications of jurors to complete the number requisite for a jury in that particular case.

The first group of additional prospective jurors came from contacts in each town in the county except Lower Brule. The sheriff testified that he initially did not contact any Lower Brule residents because 15 Lower Brule residents from the original pool did not report for jury selection. In addition, he testified the rate of absenteeism for this jurisdictional area tends to be very high.[13] The trial court, in response to Aesoph's objection, ordered another group of additional prospective jurors be contacted, including residents from Lower Brule. Three of the individuals in this second group of additional jurors actually served on the panel.

▆▆▆ [¶ 45.] Aesoph has failed to demonstrate that Native Americans were under-represented in the jury pool. Aesoph has not offered any statistics as to what number of Native Americans would be "fair and reasonable" as representative of the community. His claim is not supported by a showing that no Native Americans actually served on the jury.[14] Aesoph did not move to dismiss or strike the first group of additional jurors in favor of the second. Nor did he move to quash the jury as a whole. Therefore, Aesoph has not met his burden and we find no evidence of racial exclusion in this case.

[¶ 46.] **5. Whether the trial court erred in including a jury instruction on concealment.**

▆▆▆ [¶ 47.] Aesoph maintains that the jury instruction on concealment was inappropriate and should not have been given. The standard for reviewing a trial court's instruction to the jury is well settled:

> An appellant has the burden to show not only that the instruction given was in error, but also that it was prejudicial error to the effect that under the evidence, the jury might and probably would have returned a different verdict if the [defendant's instruction on legal excuse] had [not] been given.

*Knudson v. Hess*, 1996 SD 137, ¶ 6, 556 N.W.2d 73, 75 (citations omitted). *See also Veeder v. Kennedy*, 1999 SD 23, ¶ 32,

---

12. The venue for Aesoph's trial was changed from Hyde County to Lyman County. Therefore, the sheriff that investigated the crime, Volek, was not the same sheriff that contacted the additional jurors. Thus, there is no potential for a claim of conflict of interest. *See O'Neal v. Delo*, 44 F.3d 655, 662–63 (8thCir.1995) (holding when sheriff or staff were not participants in murder investigation, contacting additional jurors is appropriate).

13. It is worth noting that tribal members residing in Indian country, such as those living on the Lower Brule Indian Reservation, are generally not subject to state statutory requirements and cannot be compelled to appear. *See Bruguier v. Class*, 1999 SD 122, ¶ 1, 599 N.W.2d 364, 365; *Bradley v. Deloria*, 1998 SD 129, ¶ 5, 587 N.W.2d 591, 593; *Risse v. Meeks*, 1998 SD 112, ¶ 11, 585 N.W.2d 875, 877; *State v. Lufkins*, 381 N.W.2d 263, 266–67 (S.D.1986).

14. At least one juror who served in the trial had a Native American surname, as did one alternate juror.

589 N.W.2d 610, 618 (stating appellant must show that the challenged instruction was "misleading, conflicting, or confusing" and that the error was prejudicial). Furthermore, the question of prejudice "is considered 'from the standpoint of what the trial judge knew from the evidence at the time he gave this instruction.'" *Artz v. Meyers*, 1999 SD 156, ¶ 8, 603 N.W.2d 532, 534 (quoting *Del Vecchio v. Lund*, 293 N.W.2d 474, 476 (S.D.1980)). If the trial court finds an issue is competently supported by the record, then the court is justified in giving the instruction. *Id.* (citations omitted).

[¶ 48.] "Trial courts possess broad discretion in instructing the jury." *State v. Pellegrino*, 1998 SD 39, ¶ 9, 577 N.W.2d 590, 594 (citations omitted). Thus, we will not second-guess that decision absent a showing of clear and prejudicial error. We construe all of the jury instructions as a whole to determine whether a particular instruction was in error and whether that error was prejudicial. Aesoph must demonstrate that, had the jury not been given the instruction on concealment, it would likely have reached a different result. *Frazier*, 2001 SD 19 at ¶ 35, 622 N.W.2d at 259 (citations omitted).

[¶ 49.] Aesoph challenges the following instruction:

Concealment by the defendant, after the events charged in the Indictment, does not create a presumption of guilt. You may consider evidence of concealment, however, as tending to prove the defendant's consciousness of guilt. You are not required to do so. You may consider and weigh evidence of concealment by the defendant in connection with all the other evidence.

This instruction is set forth in the South Dakota Pattern Jury Instructions (criminal) at 1–14–9.

[¶ 50.] Such instructions "appear to comment on the evidence" and therefore, must be "used sparingly and only when the special circumstances and evidence require." *State v. Menard*, 424 N.W.2d 382, 384 (S.D.1988). An instruction on concealment is allowed only when the evidence supports the inferences that: (1) the defendant's conduct constituted concealment; (2) the defendant's concealment resulted from consciousness of guilt; (3) the defendant's guilt related to the crime charged; and (4) the defendant felt guilty about the crime charged because he, in fact, committed the crime. *Frazier*, 2001 SD 19 at ¶ 37, 622 N.W.2d at 259 (citing *United States v. Martinez*, 190 F.3d 673, 678 (5thCir.1999) (outlining same factors for instruction on flight)). Accordingly, Aesoph argues the instruction is in error because "[t]here is simply no evidence [Aesoph] tried to conceal his wife's body." This argument is misplaced.

[¶ 51.] While there may have been no evidence that Aesoph concealed the *body*, there was sufficient evidence that he attempted to conceal the *crime*. As noted by the trial court, there was ample evidence indicating Aesoph had killed his wife in the garage and moved her body downstairs, where he covered her with a blanket. A clump of hair matching the victim's was found under the car in the garage, blood splatters matching the victim's were found on the bottom inside panel of the garage door, and scuffmarks were found on the garage floor. Yet, the garage floor appeared as if it had been recently cleaned. Though Aesoph claimed his wife had sustained her mortal injuries in a fall down carpeted stairs, there was no blood found anywhere on the stairs, the railing, or the walls running down the stairwell. Aesoph admitted at trial that he had lied about who had started the washing machine and dryer containing Aesoph's work clothes, which were running when

police arrived. He also admitted at trial that he and his wife had fought in the garage before she allegedly fell down the stairs. All of this evidence tends to demonstrate that Aesoph was guilty, and because of that guilt, he attempted to conceal the crime. These circumstances justified the giving of a concealment instruction.

[¶ 52.] Furthermore, we have reviewed the jury instructions as a whole and find that "they provide a correct statement of the law." *Frazier*, 2001 SD 19 at ¶ 41, 622 N.W.2d at 260. Not only did the court inform the jury that "every presumption favors the defendant's innocence," but that it could ignore evidence of concealment if it so chose. *Id.* Therefore, the trial court's decision to give the instruction was neither clear nor prejudicial error.

[¶ 53.] **6. Whether the trial court abused its discretion in denying the post-conviction motion for a new trial.**

[¶ 54.] Aesoph moved for a new trial on the basis that the State failed to provide a sample of the tissue found under the victim's fingernail to the defense for testing to determine whether it was, in fact, skin. We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *Morrison v. Mineral Palace Ltd. P'ship*, 1999 SD 145, ¶ 5, 603 N.W.2d 193, 195 (noting whether new trial should be granted is "left to the sound discretion of trial court").

[¶ 55.] Aesoph contends that the failure to confirm that the tissue was skin, the withholding of this information from the defense, and the failure to instruct the jury accordingly, was enough to constitute an "irregularity" within the meaning of SDCL 15–6–59(a)(1). This section provides:

A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes:

(1) Irregularity in the proceedings of the court, jury, or adverse party or any order of the court or abuse of discretion by which either party was prevented from having a fair trial;

. . . .

Aesoph asserts that this provision entitles him to a new trial. We disagree.

[¶ 56.] Aesoph is only entitled to a fair trial, not a perfect one. *Davi v. Class*, 2000 SD 30, ¶ 51, 609 N.W.2d 107, 118 (citations omitted). While the State should have notified the defense prior to trial that the tissue had not been confirmed to be skin, this does not constitute grounds for a new trial. The failure to identify the tissue as skin was not prejudicial to the defense. As noted by the trial court:

The decision by the State Forensic Laboratory to send the particle in its entirety for DNA testing, rather than to another lab for histology testing, was reasonable given their obligation to exercise discretion in prioritizing the importance of the various objectives that could be obtained from different types of testing.

Moreover, the trial court correctly concluded that "[t]he DNA evidence obtained from particle No. 68 was ultimately of much more importance to the defense," because Aesoph was eliminated as a possible source of the tissue. The trial court did not abuse its discretion and thus there is no showing of an irregularity that warrants relief.

[¶ 57.] **7. Whether the trial court abused its discretion in revoking the pre-trial bond.**

[¶ 58.] Because we agree with the trial court's decision as to all matters set forth above, we find this issue moot.

[¶ 59.] Therefore, we affirm.

[¶ 60.]  SABERS, AMUNDSON, and KONENKAMP, Justices, and RUSCH, Circuit Judge, concur.

[¶ 61.]  RUSCH, Circuit Judge, sitting for GORS, Acting Justice, disqualified.

[¶ 62.]  ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.