#27185-a-LSW

**2015 S.D. 51**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

   v.

DAVID DEAL,                                     Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
CLAY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHERYLE W. GERING
Judge

* * * *

MARTY J. JACKLEY
Attorney General

BETHANY L. ERICKSON
Assistant Attorney General
Sioux Falls, South Dakota                       Attorneys for plaintiff
                                                and appellee.


A. JASON RUMPCA of
Peterson, Stuart, Rumpca
  & Rasmussen, Prof., LLC
Beresford, South Dakota                         Attorneys for defendant
                                                and appellant.


* * * *

                                                CONSIDERED ON BRIEFS
                                                ON APRIL 20, 2015

                                                OPINION FILED **06/24/15**

#27185

WILBUR, Justice

[¶1.]     David Deal was convicted of first-degree rape and sexual contact with a child under the age of 16.  Deal alleges that the circuit court committed reversible error when it denied his motion for judgment of acquittal and his motion to suppress statements in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  We affirm.

## Background

[¶2.]     In August of 2013, Deal hosted a hog roast at his cabin outside of Vermillion, South Dakota.  L.S.S. attended the hog roast with his daughter L.S., age seven at the time, and her younger sister N.S.  L.S.S. was going through a separation with his wife, A.S., at the time.  During the weeks following the hog roast, L.S. began exhibiting changes in her behavior.  A.S. received phone calls "a couple times a week" from L.S.'s first-grade teacher regarding her behavior.  Her teacher mentioned that L.S. was becoming more aggressive and demanded attention at school.  Previously, when L.S. was in kindergarten, A.S. never "had an issue" or "had to talk to the teacher" about L.S.

[¶3.]     On November 26, 2013, L.S. got in trouble at school.  L.S. explained to A.S. that nothing happened and that she was fine.  Later that evening, A.S. told her boyfriend, R.E., that children can act out after being molested.  R.E. asked A.S. if she would like him to talk with L.S., and she said, "[Y]ou can give it a try."  He asked L.S. if her classmates were being mean to her or if any adults were mistreating her.  He then asked her if any person had given her a "bad hug."  She answered "yes."  He asked her who gave her a "bad hug," and she said "Dave."  R.E.

-1-

informed A.S. what L.S. shared with him about David Deal.  In a subsequent conversation, L.S. told A.S. that Deal put his hand down her pants and digitally penetrated her.  A.S. immediately called law enforcement and reported the incident.  A.S. then called Deal and confronted him about the allegation.  Deal denied touching L.S.

[¶4.]		The next day on November 27, 2013, Chief Deputy Jerami West met with A.S. and L.S. at the Child Advocacy Center in Sioux City, Iowa.  L.S. underwent a forensic interview where she described the incident to the interviewer.  L.S. stated that on the night of the incident, everyone was sitting around a fire pit outside of Deal's cabin.  She went inside the cabin by herself to use the bathroom.  On her way to the bathroom, Deal grabbed her and put his hand down her pants and touched her genital area.  She told him to stop and he refused.  L.S. then hit him on his back or stomach and ran into the bathroom and shut the door.  She said Deal knocked on the door and shouted, "[O]pen this door."  She described the bathroom door as having a "lock that you twist."  At trial, Deal presented photographs of the sliding bathroom door and L.S. acknowledged that there was no lock on the sliding door.

[¶5.]		Law enforcement officers unsuccessfully attempted to contact Deal over the course of the next few days.  On the following Monday, December 2, 2013, officers learned that Deal had not shown up to work.  The officers were told that this was unusual.  Based on this information, law enforcement officers performed a welfare check at Deal's home, but he was not there.  The next morning, Deal was found at the bottom of the river bluff near a park in Vermillion.  He was found alive,

lying in the snow with his face swollen and his left eye nearly swollen shut, bruises and scrapes on his body, and superficial cuts to both wrists. He was missing his cell phone, one of his shoes, his driver's license, and his glasses. Deal was transferred to the Intensive Care Unit at Avera Hospital in Sioux Falls for treatment of his injuries.

[¶6.] While Deal was being treated at the hospital, law enforcement executed a search warrant of his home to investigate what happened to him and to attempt to discover any evidence of a crime or struggle that would explain Deal's condition. Inside the house, law enforcement officers found evidence that suggested Deal attempted suicide. Near Deal's bathtub, which was half full of water, was a box cutter, assorted razor blades, a sock filled with broken glass, two empty bottles of Tylenol, a bottle of whiskey, a can of air duster, and a laptop computer displaying a family picture. The State presented this evidence to the jury along with a jury instruction stating that an attempt to commit suicide can be considered as tending to prove Deal's consciousness of guilt.

[¶7.] On December 13, 2013, a Clay County Grand Jury indicted Deal on the charge of first-degree rape in violation of SDCL 22-22-1(1). That same day, Avera Hospital released Deal. West traveled to Deal's home that afternoon and knocked on his front door. West and Deal talked for a short while on the front porch. Noticing that Deal was cold and shaking, West suggested they continue the discussion in his patrol car where it was warmer. West sat in the driver's seat and Deal sat in the front passenger seat for the remainder of the interview. The conversation continued in the patrol car. There was no indication that the patrol

car was locked.  The dash camera in the patrol car recorded the conversation, but because the camera was pointed in the opposite direction, the camera only recorded audio of the conversation.  West testified at trial as to Deal's demeanor during the conversation.

[¶8.]     West's initial questions focused on Deal's well-being, his treatment at the hospital, and his recollection of the circumstances leading to his hospitalization.  After these initial questions, West stated that he was "changing gears" and proceeded to read Deal each of his *Miranda* rights.  Deal acknowledged his understanding of each right.  West then asked Deal if he wished to waive these rights.  Deal paused and did not answer immediately.  He eventually said, "Well, I don't know, I guess I don't really know what we are talking about."  West again inquired if Deal wished to talk, to which Deal responded, "I guess so."

[¶9.]     West questioned Deal about the items found in his home that according to West, tended to suggest an attempted suicide.  Eventually, West told Deal that he thought the reason Deal attempted suicide was because of the phone call Deal received from A.S. about L.S.  West then questioned Deal about the rape.  Deal made no verbal admissions to sexual contact or rape.  At trial, West testified about Deal's physical response, including tearing up, shaking, and nervousness in response to these questions.  After the interview, West placed Deal under arrest.  West was aware of Deal's indictment on the charge of rape and had a warrant in hand to arrest Deal for that offense at the time of the interview.

[¶10.]    Deal filed a motion to suppress all statements, confessions, or admissions that he made to West on December 13, 2013.  Deal also moved to

suppress all evidence gathered as a result of the questioning, including his demeanor and body language observed by West. Deal contended that the statements, confessions, and admissions were elicited from him while he was "in custody pursuant to an interrogation when [he] did not knowingly, intelligently and voluntarily waive his *Miranda* rights to remain silent or to request the assistance of an attorney." The circuit court denied the motion. At trial, Deal asked the court to enter judgment of acquittal. The court also denied this motion. On May 13, 2014, a jury found Deal guilty of first-degree rape in violation of SDCL 22-22-1(1) and sexual contact with a child under the age of 16 in violation of SDCL 22-22-7. The court sentenced Deal to the South Dakota State Penitentiary. The court entered findings of fact and conclusions of law in support of the court's denial of Deal's motion to suppress statements. Deal appeals and raises the following two issues for our review:

1. Whether the circuit court erred when it denied Deal's motion to suppress statements in violation of *Miranda*.

2. Whether the circuit court erred when it denied Deal's motion for judgment of acquittal.

**Analysis**

[¶11.] **1. Whether the circuit court erred when it denied Deal's motion to suppress statements in violation of *Miranda*.**

[¶12.] Deal contends that the circuit court erred when it denied his motion to suppress. He asserts that he was in custody at the time of his interview, he did not voluntarily waive his *Miranda* rights, and West's observations were testimonial. However, the circuit court concluded that West was not required to read Deal his *Miranda* warnings because "a reasonable person in [Deal's] situation would feel at

-5-

liberty to leave" and, therefore, he was not in custody. Furthermore, the circuit court found that even assuming Deal was in custody, he voluntarily waived his *Miranda* rights because he "understood his rights and engaged in a course of conduct reflecting a desire to give up those rights." Finally, the court concluded, "even if *Miranda* is applicable in this case," West's "observations of tearing up, shaking, and other physical evidence of nervousness are non-testimonial and not subject to *Miranda* analysis[.]."

[¶13.]    "Police officers are not required to administer *Miranda* warnings to everyone whom they question." *State v. Aesoph*, 2002 S.D. 71, ¶ 17, 647 N.W.2d 743, 751 (quoting *State v. Thompson*, 1997 S.D. 15, ¶ 23, 560 N.W.2d 535, 540). Although "interviews with law enforcement will naturally have coercive pressures," *State v. Johnson*, 2015 S.D. 7, ¶ 15, 860 N.W.2d 235, 242, *Miranda* warnings are required "only when a suspect interrogated by the police is 'in custody.'" *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S. Ct. 457, 460, 133 L. Ed. 2d 383 (1995).

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'

*Thompson*, 1997 S.D. 15, ¶ 23, 560 N.W.2d at 540 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977)). We adhere to the two-part test stated in the United States Supreme Court decision *Thompson* "to

determine whether an individual is in custody at the time of questioning[.]" *State v. Walth*, 2011 S.D. 77, ¶ 12, 806 N.W.2d 623, 626. "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112, 116 S. Ct. at 465 (footnote omitted). "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275 (1983) (per curiam)) (internal quotation marks omitted); *see also McDonough v. Weber*, 2015 S.D. 1, ¶ 25, 859 N.W.2d 26, 38.

[¶14.] We review a circuit court's factual determination regarding the circumstances surrounding the interrogation "under the clearly erroneous standard." *State v. Bowker*, 2008 S.D. 61, ¶ 27, 754 N.W.2d 56, 65 (citing *Aesoph*, 2002 S.D. 71, ¶ 12, 647 N.W.2d at 750). But the application of the factual determination to the second part of the test of "whether a reasonable person under those circumstances would consider themselves to be in custody is a question of law" reviewed de novo. *Walth*, 2011 S.D. 77, ¶ 13, 806 N.W.2d at 626 (quoting *Bowker*, 2008 S.D. 61, ¶ 27, 754 N.W.2d at 65). "The ultimate determination, therefore, presents a mixed question of law and fact qualifying for independent review." *Bowker*, 2008 S.D. 61, ¶ 27, 754 N.W.2d at 65 (internal quotation marks omitted).

[¶15.]     Here, West began questioning Deal on the front porch of Deal's home. We have recognized that "'[c]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home." *State v. Herting*, 2000 S.D. 12, ¶ 14, 604 N.W.2d 863, 867 (quoting *United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998)). West observed that Deal was cold and shivering. At trial, the State introduced evidence indicating that there was snow on the ground. The record also reflects that West was aware that Deal had been released that day from the hospital, where he received treatment for his extensive injuries. West testified that he asked Deal "if he wanted to go sit in [the patrol] car . . . where he could be warm." The patrol car was positioned on the street in front of Deal's home. Deal agreed and sat in the front passenger seat while West sat in the driver's seat of the patrol car.

[¶16.]     Deal argues that a reasonable person in his position would have understood that he was in custody. First, he contends that West did not inform him at the time of the interview that the questioning was voluntary. Second, he assumed that the patrol car was locked and, as a result, he did not feel free to leave. Third, he did not feel free to leave because West had told him at the hospital that he needed to talk to him about his "registration." Fourth, Deal argues that West strong-armed him into entering the patrol car and used deceptive tactics that misled Deal about the matter to be discussed when questioning him. Fifth, Deal alleges that the atmosphere of the interview was "police dominated." Finally, Deal states that he was ultimately arrested at the conclusion of the questioning.

[¶17.]    We point out, however, that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Thompson*, 1997 S.D. 15, ¶ 25, 560 N.W.2d at 540 (quoting *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529, 128 L. Ed. 2d 293 (1994)). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *State v. Gesinger*, 1997 S.D. 6, ¶ 18, 559 N.W.2d 549, 552 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L. Ed. 2d 317 (1984)). Thus, whether Deal subjectively believed that the doors of the patrol car were locked is not relevant to this determination. Instead, the question is whether a reasonable person would have understood that he was not free to leave.

[¶18.]    We are not convinced that the objective circumstances surrounding Deal's interrogation were such that a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. The interview began in a familiar location, on Deal's front porch, and after it appeared to West that Deal was cold and shivering, transitioned to the chief deputy's patrol car parked on the street in front of Deal's home. A reasonable person under similar circumstances would understand that West's decision to continue the interview in his patrol car was not part of a coercive tactic to restrict his freedom to leave. Moreover, at no point during the interview did West indicate to Deal that he was not free to leave the patrol car nor did West restrain Deal's ability to leave. Our review of the objective circumstances surrounding the questioning of Deal indicates he was "not so deprived of his freedom as to be 'in custody' for *Miranda* purposes." *Thompson*,

1997 S.D. 15, ¶ 26, 560 N.W.2d at 541. Therefore, the circuit court did not err in ruling that Deal was not in custody at the time of the interview.

[¶19.] **2. Whether the circuit court erred when it denied Deal's motion for judgment of acquittal.**

[¶20.] Next, Deal argues that the State presented insufficient evidence to sustain his convictions of first-degree rape in violation of SDCL 22-22-1(1) and sexual contact with a child under the age of 16 in violation of SDCL 22-22-7. We review whether the State provided sufficient evidence to sustain the conviction de novo. *State v. Hauge*, 2013 S.D. 26, ¶ 12, 829 N.W.2d 145, 149. "The question is whether 'there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt.'" *State v. Beck*, 2010 S.D. 52, ¶ 7, 785 N.W.2d 288, 292 (quoting *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342). "Claims of insufficient evidence are 'viewed in the light most favorable to the verdict.'" *State v. Morgan*, 2012 S.D. 87, ¶ 10, 824 N.W.2d 98, 100 (quoting *Beck*, 2010 S.D. 52, ¶ 7, 785 N.W.2d at 292). "We will not resolve conflicts in the evidence, assess the credibility of witnesses, or reevaluate the weight of the evidence." *State v. Hayes*, 2014 S.D. 72, ¶ 39, 855 N.W.2d 668, 680 (quoting *Hauge*, 2013 S.D. 26, ¶ 12, 829 N.W.2d at 149). Therefore, "a guilty verdict will not be set aside if the State's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." *State v. Johnson*, 2009 S.D. 67, ¶ 10, 771 N.W.2d 360, 365 (quoting *State v. Mulligan*, 2007 S.D. 67, ¶ 7, 736 N.W.2d 808, 813).

***First-Degree Rape***

[¶21.]     First-degree rape occurs when the defendant commits an "act of sexual penetration" with a victim "less than thirteen years of age[.]" SDCL 22-22-1(1).  It is undisputed that L.S. was less than thirteen years of age at the time.  At trial and during her interview with the Child Advocacy Center, L.S. stated that Deal grabbed her on her way to the restroom at his cabin.  She said that he put his hand down her pants and underwear and digitally penetrated her.  She told him to stop and that it hurt.  Other witnesses, including A.S., R.E., and West, corroborated L.S.'s statements regarding the act of sexual penetration.  The State also presented evidence that Deal attempted to commit suicide after A.S. called him and confronted him about his conduct with L.S., which tends to prove Deal's consciousness of guilt.

[¶22.]     Deal argues, however, that due to two inconsistencies in L.S.'s testimony, the evidence was not "sufficient to support a verdict of guilty beyond a reasonable doubt."  First, Deal argues "[t]here was no evidence to corroborate the story that L.S. and A.S. told about being physically damaged by the sexual assault to the point where blood was left on the toilet seat days after the alleged assault occurred."  Second, Deal alleges that "L.S.'s story of getting away and locking the door behind her is not possibly true" because, "when presented with photos of the sliding bathroom door, L.S. acknowledged that there was no lock on the sliding door she claimed to have locked."  Our standard of review, however, "does not permit us to 'resolve conflicts in testimony, pass on the credibility of witnesses, or weigh evidence.'" *State v. McKinney*, 2005 S.D. 73, ¶ 27, 699 N.W.2d 471, 480 (quoting

*State v. Hage*, 532 N.W.2d 406, 410-11 (S.D. 1995)). "When there is a conflict in witness testimony, it is the *function of the trier of fact* to 'resolve the factual conflicts, weigh credibility, and sort out the truth.'" *LeGrand v. Weber*, 2014 S.D. 71, ¶ 36, 855 N.W.2d 121, 131 (quoting *State v. Guthmiller*, 2014 S.D. 7, ¶ 27, 843 N.W.2d 364, 372) (emphasis added). The jury listened to testimony and was presented with evidence of these inconsistencies. Nevertheless, after resolving the factual conflicts and weighing credibility, the jury found Deal guilty of the charged offense. Because this Court defers to the circuit court based on its ability to observe the witnesses, we decline to "substitute our judgment as to the weight and credibility" of this evidence. *See Hubbard v. City of Pierre*, 2010 S.D. 55, ¶ 27, 784 N.W.2d 499, 511. When viewed in the light most favorable to the verdict, we conclude that sufficient evidence in the record existed to support a rational theory of guilt of first-degree rape.

### *Sexual Contact*

[¶23.] Sexual contact with a child under the age of 16 occurs when the defendant is "sixteen years of age or older" and "knowingly engages in sexual contact with another person, other than that person's spouse if the other person is under the age of sixteen years[.]" SDCL 22-22-7. This Court has previously said that "the offenses of rape and sexual contact are mutually exclusive." *State v. Brammer*, 304 N.W.2d 111, 114 (S.D. 1981); *see also State v. Buchhold*, 2007 S.D. 15, ¶¶ 19-26, 727 N.W.2d 816, 821-23. Likewise, SDCL 22-22-7.1 provides, "As used in this chapter, the term, sexual contact, means any touching, *not amounting to rape . . . .*" (Emphasis added.) Accordingly, a defendant may not be convicted of

both rape in violation of SDCL 22-22-1 and sexual contact in violation of SDCL 22-22-7 from conduct arising out of only one act. *See Brammer*, 304 N.W.2d at 114.

[¶24.]      Here, a review of the record demonstrates that the jury may have found that Deal committed an act of sexual contact in addition to the act that constituted rape. L.S. stated in her forensic interview at the Child Advocacy Center that Deal touched her at least two separate times. She said that he digitally penetrated her by grabbing her and putting his hand down her pants. She then said: "I was trying to run because I didn't want him to do anything else, but he grabbed me. Then he touched me again." Later in the interview, she said, "He started to do it one time, then he did it again and he did it even harder. And I couldn't get him to stop that time." At trial, the forensic interviewer at the Child Advocacy Center, Sherrie Schweder, testified about this interview and corroborated L.S.'s statements. The jury viewed the video of the forensic interview at trial. We conclude that there was sufficient evidence in the record, when viewed in the light most favorable to the jury verdict, to support a finding by the jury that Deal knowingly engaged in an act of sexual contact with L.S independent of the act constituting rape.

[¶25.]      We affirm.

[¶26.]      GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.